**STANDARD FITTINGS COMPANY, Petitioner Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent Cross-Petitioner.**

No. 87–4608.

United States Court of Appeals, Fifth Circuit.

May 31, 1988.

Lawrence J. Molony, Metairie, La., for petitioner cross-respondent.

William A. Baudler, Eileen Armstrong, Dept. Assoc. Gen. Counsel, N.L.R.B., Collis Suzanne Stocking, Washington, D.C., for respondent cross-petitioner.

Before REAVLEY, KING, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Standard Fittings Company, which was losing money dramatically, failed to implement a wage increase called for under its collective bargaining agreement. The Oil, Chemical & Atomic Workers International Union, representing the bargaining unit, filed an unfair labor practice for refusal to bargain. The National Labor Relations Board (NLRB) affirmed an administrative law judge's "make-whole" remedy against Standard Fittings, since its unilateral change in the collective bargaining agreement constituted a refusal to bargain. Standard Fittings petitions this court to review and set aside the NLRB's order; the NLRB cross-petitions for enforcement of its order. Standard Fittings argues that there is legal error in the administrative fact-findings (1) that the union's counterproposal on postponing the raise was legally conditioned on ratification by the union membership; (2) that non-union bargaining unit members could properly be excluded from the ratification process; (3) that the employer had not reached "impasse" in the negotiations; and (4) that the employer had an obligation to "continue to talk with the union." However, it is clear that Standard Fittings did not have a unilateral right to change a contract term that is a mandatory

subject of bargaining, even if Standard Fittings bargained to an impasse with the union over the wage increase. Bargaining directly with the employees and ignoring the union was, therefore, an equally blatant violation of the employer's duty to bargain. Accordingly, we deny Standard Fittings' petition for review and grant the NLRB's cross-petition for enforcement.

## I.

### Standard Fittings' Problem and the Impermissible Solution It Implemented.

Production and maintenance employees at Standard Fittings' Opelousas, Louisiana, facility are represented by the Oil, Chemical & Atomic Workers International Union. Standard Fittings and the union had agreed to a collective bargaining agreement that ran from March 1, 1984, through March 1, 1986. According to the terms of that agreement, Standard Fittings agreed to raise the wages of the employees whom the union represented by $.35/hour on March 1, 1985.

Standard Fittings felt itself financially unable to increase the employees' wages by the agreed amount on March 1, 1985. Standard Fittings manufactures and distributes forged steel and pipe fittings, but its business in the early 1980s was apparently quite poor. Its president, Erwin Davlin, met with the union's negotiating committee on February 20, 1985, in an effort to obtain union consent to delaying the $.35/hour wage increase for nine months. He told the committee that if it did not agree to his proposal, Standard Fittings would be forced to take drastic action: The company would either have to lay off a large number of workers, or reduce their hours from 40 per week to 30 or 32 hours per week. Davlin told the union officials that if he did not take one of these courses of action, Standard Fittings would be forced to file for bankruptcy.

Understanding the gravity of the situation and that Standard Fittings had a specific contractual right to schedule hours of work and to reduce the number of employees by layoff, the union was cooperative.

After examining the company's books, the union negotiating committee again met with Davlin on March 6. They explained that the union would be willing to accept a six-month delay in the $.35/hour increase, but conditioned this counter-proposal on ratification "by the membership."

Davlin accepted the union's offer and its terms. He later testified that he thought that all unit members, including nonunion employees, would be voting. On March 14, at the union local's monthly meeting, 119 of the bargaining unit's 300 members voted on the counterproposal. These union members defeated that proposed modification by a margin of 97–22. This lopsided result represented a majority of those present and voting, but a minority of the total employees affected by the decision.

The next morning, the union informed Davlin that the membership had rejected the counterproposal offered by the leadership. Davlin insisted that the union negotiating committee call a special membership meeting to reconsider the postponement. The members of the negotiating committee informed Davlin that they could not call a special meeting without twenty signatures of members of the local. Davlin then told the committee that he was going to talk to the employees directly regarding his request to delay the $.35/hour wage increase.

On Monday, March 18, the officials of the local called the international headquarters of the union and obtained permission to call a special meeting. But when the local's officers informed Standard Fittings that they were calling another vote, Davlin told them that he was not going to wait for the special meeting, but would instead meet directly with the union employees that day.

Throughout the week beginning March 18, Davlin held meetings with Standard Fittings' employees. There were two series of such direct appeals to the labor force —meeting all the employees, union and non-union, but in groups of approximately twenty persons each. In the first series of meetings on March 18 and 19, Davlin described the company's financial situation

and explained why the company wanted to delay the scheduled wage increase. During the second series of meetings, on March 21 and 22, Davlin told the employees that each employee individually was to choose to accept a delay in the promised raise, with no reduction in hours, or receive the scheduled wage increase knowing that the company would be forced to reduce that employee's hours from 40 to 30 hours per week.

Many of the employees agreed to postpone their $.35/hour raise. A few, however, did not accept the appeal to delay the increase; the company cut those employees' work week back to 30 hours, but implemented the contractual wage increase for such reduced hours. Standard Fittings did eventually increase all the employees' wages by $.35/hour, but not until October 1, 1985. The eventual raise was not retroactive for those workers whose hours had not been cut but who forewent the increase for seven months.

## II.

### The NLRB Proceeding.

The union thereafter filed an unfair labor practice complaint, in which it charged that Standard Fittings, in violation of section 8(a)(5) of the National Labor Relations Act (NLRA), had refused to bargain collectively with the union and had violated the employees' rights to engage in a protected, concerted labor activity under section 8(a)(1) of the NLRA. After a hearing on these unfair labor practice charges, the administrative law judge (ALJ) agreed with the union.

The ALJ imposed a "make whole" remedy on Standard Fittings. A "make-whole" remedy imposes upon the employer the obligation to pay each employee the difference between what the employee would have made had the employee received the scheduled wage increase on time and what the employee actually made. On appeal to the NLRB, a three-member panel affirmed the ALJ's findings of fact and conclusions of law.

The standard of review for questions of law determined by the NLRB is de novo, but if an NLRB construction of the statute is "reasonably defensible," its decisions are to be confirmed. *See, e.g., Pattern Makers' League v. NLRB,* 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985); *NLRB v. Local Union 103, Iron Workers,* 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978); *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). The ALJ's findings of fact, which include his finding that Standard Fittings accepted the counterproposal and did not bargain to impasse with the union, must be reviewed under the substantial evidence standard of review. NLRA § 10(e); *NLRB v. Strong Roofing & Insulating Co.,* 393 U.S. 357, 361, 89 S.Ct. 541, 545, 21 L.Ed.2d 546 (1969) (section 10(e) allows only limited judicial review); *Capital-Hustling Co. v. NLRB,* 671 F.2d 237, 243 (7th Cir.1982). Under that standard of review, the ALJ's decision must be upheld if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion had the matter been presented to it in the first instance. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Georgia Kraft Co. v. NLRB,* 696 F.2d 931, 936 (5th Cir.1983); *Central Freight Lines, Inc. v. NLRB,* 666 F.2d 238, 239 (5th Cir.1982).

## III.

### Mandatory Subjects of Bargaining and the Duty To Bargain.

This case is a textbook example of the most serious kinds of problems which an employer faces in meeting its duty to bargain. Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of its employees." Section 9(a) of the NLRA says that a union properly chosen to represent a bargaining unit "shall be the exclusive representative of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment."

■ The Supreme Court, reading these provisions together, has interpreted them

to mean that an employer must bargain with a union representing its employees before unilaterally changing *any* term of employment, whether a mandatory or a permissive bargaining provision. *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). If the mandatory subject of bargaining which the employer wishes to change is the subject of a provision in a collective bargaining agreement, the employer commits an unfair labor practice if it changes that condition without the permission of the union. Section 8(d) of the NLRA prohibits either party from insisting upon a modification of the agreement during its term. While a contract is in force, section 8(d) permits the union to refuse, even unreasonably, an employer's proposal to modify the terms established by the collective bargaining agreement.

The union thus need not assent to proposed changes in the contract, no matter how necessary to the survival of the enterprise. The result may be harsh, but the law is clear that a party may not escape its obligations under a collective bargaining agreement because of financial difficulties. *NLRB v. L.B. Priester & Son, Inc.*, 669 F.2d 355 (5th Cir.1982) (restricting when an employer may withdraw from a unit because of financial circumstances, in order to ensure the continued vitality of multi-employer bargaining); *George E. Light Boat Storage, Inc. v. NLRB*, 373 F.2d 762, 765–66 (5th Cir.1967) (economic adversity does not justify an employer's unilateral midterm modification of a collective bargaining agreement); *NLRB v. Lambert*, 211 F.2d 91, 92–94 (5th Cir.1954) (unilateral changes in contract terms relating to employees' fringe benefits because of "not having finances to pay them," and refusal to bargain because employer could not "afford to operate under a union agreement any longer," both violate the Act); *A & W Foods, Inc.*, 276 N.L.R.B. 20 (1985); *Manley Truck Line, Inc.*, 271 N.L.R.B. 679 (1984), *enf'd, NLRB v. Manley Truck Line,*

*Inc.*, 779 F.2d 1327, 1329–32 (7th Cir.1985) (temporary withholding of portion of wages due to employees under collective bargaining agreement held unlawful despite financial hardship).

Regardless of whether terms or conditions of employment are explicitly covered by contract provisions, a mid-term, unilateral alteration by either the union or the employer breaches the agreement and gives rise to a civil action seeking contract remedies. But when the term is a mandatory subject of bargaining, the parties can also seek to have the NLRB enforce the agreement through its power to remedy violations of the duty to bargain under section 8(a)(5). *Allied Chemical & Alkali Workers, Local 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967) (emphasizing that though there is no general jurisdiction for the NLRB to enforce collective bargaining agreements, where there has been an unfair labor practice NLRB adjudication is speedier than suit for breach of contract).

The collective bargaining agreement established the March 1, 1985, wage increase as an explicit "term or condition of employment," which Standard Fittings could *not* change without bargaining with the union —and obtaining its assent—regarding the proposed postponement. *Katz*, 369 U.S. at 742, 82 S.Ct. at 1111. Because the $.35/hour raise was a mandatory subject of bargaining, Standard Fittings could neither insist that the union agree to the mid-term alteration of the contract, nor delay the pay increase without the union's consent.[1]

## IV.

### *Impasse and the Asserted Waiver of Section 8(d) Rights.*

■ The union was under no obligation to consider Standard Fittings' request to

---

**1.** NLRA §§ 8(a)(5) and (d); *Allied Chemical,* 404 U.S. at 185, 92 S.Ct. at 400; *Texaco, Inc. v. NLRB,* 722 F.2d 1226, 1236 (5th Cir.1984) ("[It is] settled that an employer who puts into effect tentatively approved proposals without awaiting the ratification vote by the union membership

[where the parties understand that such ratification is necessary] unlawfully engages in unilateral action in violation of 8(a)(5)."); *Electri-Flex Co. v. NLRB,* 570 F.2d 1327, 1338 (7th Cir.), *cert. denied,* 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978).

**1316**

modify the terms of the unexpired collective bargaining agreement. Because the wage increase was a mandatory term of that contract, Standard Fittings may not claim that it bargained to impasse with the union.[2] Since section 8(d) prohibits the employer from forcing the union to alter the agreement during its term, whether impasse with the union was reached is irrelevant; the union need not have agreed to the proposal, and Standard Fittings could not legally make the change without the union's consent. *Allied Chemical,* 404 U.S. at 188, 92 S.Ct. at 402. The ability of the NLRB, by virtue of the *Katz* decision, to order cessation of refusals to negotiate or other obstructionist tactics does not extend to subjects protected under section 8(d), and it would have been an unfair labor practice for Standard Fittings to have attempted to coerce union acceptance of the postponement.

Standard Fittings argues that the union waived its right to refuse to bargain over delaying the wage increase by, in fact, beginning to bargain over the wage increase. However, not only would such a view be contrary to common sense and public policy, but only a contractual agreement to reopen some of the terms of a collective bargaining agreement for renegotiation suffices as a waiver of the right under section 8(d) to refuse to negotiate. A party to a collective bargaining agreement does not waive its right to refuse midterm contract modifications by agreeing to discuss modification proposals.[3] Absent an express reopener, neither the union nor the employer ever waives the statutory right to refuse to consider, or to continue to consider, changes in the collective bargaining agreement while the agreement is still in force. *Herman Brothers,* 273 N.L.R.B. at 126.

Standard Fittings relies on cases concerning unilateral implementation of final offers where parties have reached impasse concerning matters not governed by an existing contract.[4] But at issue in this case are discussions of possible modifications of a mandatory subject of bargaining in an existing contract, for which there was no reopener provision. The union, again, had no obligation even to discuss, much less to agree to, any modification.[5]

2. Unilateral changes in wages or other mandatory subjects of bargaining constitute unlawful refusals to bargain. *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 674, 101 S.Ct. 2573, 2578, 69 L.Ed.2d 318 (1981); *NLRB v. Haberman Constr. Co.,* 641 F.2d 351, 357 (5th Cir. Apr. 1981) (en banc). Only if the provision is a mandatory subject of bargaining, however, does a mid-term unilateral modification of the collective bargaining agreement automatically constitute a violation of § 8(a)(5). *Allied Chemical & Alkali Workers, Local 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 183–88, 92 S.Ct. 383, 399–402, 30 L.Ed.2d 341 (1971); *NLRB v. L.B. Priester & Sons, Inc.,* 669 F.2d 355, 363–64 (5th Cir.1982); *NLRB v. Manley Truck Line, Inc.,* 779 F.2d 1327, 1329–32 (7th Cir.1985). If the employer changes a term of employment that is not the subject of a collective bargaining agreement provision, it must still first bargain with the union. During the period of time in which express terms are guaranteed under the collective bargaining agreement, an employer must bargain to "impasse" with the union before modifying such non-contractual terms of employment. Unless impasse is reached, the employer commits an unfair labor practice in changing non-contractual terms of employment. *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Once impasse is reached unilateral alteration of terms of employment not subject to express provisions of the agreement may not be an unfair labor practice, even if it would breach the contract.

3. *Herman Bros.,* 273 N.L.R.B. 124, 126 (1984), enf'd mem., 780 F.2d 1015 (3d Cir.1985) ("[A union does] not tacitly agree to reopen the contract, thereby incurring a bargaining obligation, simply by agreeing to discuss the [employer's] proposed midterm wage modifications and offering its own counterproposals."); *A & W Foods, Inc.,* 276 N.L.R.B. 20 (1985) (by making its counterproposal to the company, the union did not incur an additional bargaining obligation); *Connecticut Light & Power Co.,* 271 N.L.R.B. 766, 766–67 (1984) (neither the recipient of a midterm proposal nor even the party proposing a midterm modification incurs any bargaining obligation by receiving or tendering the proposal).

4. *Huck Mfg. Co. v. NLRB,* 693 F.2d 1176 (5th Cir.1982); *A.H. Belo Corp. v. NLRB,* 411 F.2d 959 (5th Cir.1969); *NLRB v. Tex-Tan, Inc.,* 318 F.2d 472 (5th Cir.1964).

5. There has to be a bargaining obligation in order to have impasse, so impasse applies only to those terms reopened. A contrary rule would result in the inapposite circumstance that impasse could never be asserted so long as a party

■ In any event, as the NLRB found, in this case there was no showing of impasse. As Standard Fittings must recognize, this is an issue "particularly amenable to the expertise of the [NLRB] as fact finder." *Huck Manufacturing Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir.1982). The ALJ below, as confirmed by the NLRB, considered whether the initial agreement to bring the postponement of the automatic raise to a union vote constituted a reopening of the wage increase provision. While there was no waiver of the right to refuse to consider, or to continue to consider, proposed modifications of the terms of employment, the ALJ's finding that Standard Fittings failed to bargain to impasse with the union would easily survive review under the substantial evidence standard. Nothing short of a union's refusal to bargain excuses an employer from refusing to bar-

gain or from unilaterally changing contract terms affecting mandatory subjects of bargaining; the union's cooperativeness here falls far short of such a refusal to bargain.[6]

.V.

*Illegally Bargaining Directly with the Workers; the Union's Alleged Unfair Labor Practice.*

■ Standard Fittings argues that the union breached its duty of fair representation, giving the company the right to appeal directly to its employees.[7] Recognizing, however, that a union's duty of representation is owed solely to its members, the Court in *Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954), held that an employer may not rely on its employees' rights to justify refusing to bargain with a formally designated union.[8] Thus, since no

obdurately refused to consider proposed changes; but as soon as a party consented to consider modifications where there was no preexisting bargaining obligation, then its voluntary consideration of the proposal would trap it with an asserted impasse if final agreement could not be reached. The party proposing modification, therefore, would immediately enjoy the benefits of a bargaining obligation where there was none and would have created the environment for impasse should the other side have been at all cooperative. Every provision of the NLRA evinces the purpose to foster harmonious industrial negotiation, and the outcome Standard Fittings urges would curtail all voluntary bargaining because reasonable accommodation of the other party would curtail the ultimate right to refuse consent once any negotiations were undertaken.

6. Even if bargaining to impasse were relevant, the union, with absolutely no legal obligation to do so, made a good-faith effort to negotiate about postponing the wage increase and otherwise pursuing a mutually acceptable response to Standard Fitting's financial problems and need for a nine-month 10% wage concession. The first membership vote was overwhelmingly adverse, but the officers of the local were going to extraordinary lengths to assist the company. The very day that Standard Fitting illegitimately bypassed the union and bargained directly with the employees, the union was prepared to call a special meeting of its members to consider whatever proposals Standard Fittings wished to advance. Thus even had the union waived its right not to consider changes in the collective bargaining agreement, Standard Fittings could not convincingly assert an impasse with the union permitting it to make a unilateral change in a condition of employment. Indeed, the

NLRB's finding of no impasse on this issue is amply supported by the record, including the uncontested evidence of an offer to call a special meeting as the company had requested.

7. Standard Fittings also mischaracterizes its meetings with the employees as being for the purpose of "communicat[ing] with unit members as to the progress of union negotiations," as NLRA § 8(c) would permit. Standard Fittings had ceased negotiating with the union concerning deferral of the wage increase. President Davlin admitted that he did not merely report to the employees about prior negotiations, but required each employee to choose individually whether to work at his or her former wage rate for 40 hours per week (for a "gross take home" of $200) or to work at the contractually required increased rate for only 30 hours per week (for a gross of $160); thereafter, the company treated each employee in accord with his or her individual choice.

8. *NLRB v. Electra-Food Machinery, Inc.*, 621 F.2d 956, 958 (9th Cir.1980) ("[I]nternal union matters ... cannot relieve an employer from its bargaining duty or affect the validity of collective bargaining agreements."). *Accord, Newtown Corp.*, 280 N.L.R.B. 38, 122 L.R.R.M. 1227, 1229 (1986), *enf'd*, 819 F.2d 677, 678 (6th Cir. 1987) (per curiam). Standard Fitting's reliance on *International Brotherhood of Teamsters v. NLRB*, 587 F.2d 1176 (D.C.Cir.1978), is misplaced. In that case, members of a multi-union negotiating committee demonstrated a hostile intention to deprive the members of one of the unions in the unit of their right to participate in the bargaining process and thereby violated their duty of fair representation. However, the

breach of a union's duty of fair representation can negate an employer's duty to bargain, Standard Fittings would have no defense, even if it could establish an unfair labor practice on the part of the union.

■ Attempting to justify its illegal direct negotiation [9] by invoking the "rights" of its non-union employees, Standard Fittings relies on *Branch 6000, National Association of Letter Carriers v. NLRB*, 595 F.2d 808 (D.C.Cir.1979), for the proposition that the union acted illegally in prohibiting non-members from voting on ratification of the union's counter-proposal.[10] Even if Standard Fittings were in a position properly to assert this alleged unfair exclusion of non-union employees, the company's reading of the easily distinguishable authority does not materially advance its case.

The company's claim that any union that agrees to membership ratification of a contract proposal must permit non-union employees to vote on the issue is contrary to well established law. While *Letter Carriers* and *International Brotherhood of Teamsters v. NLRB*, 587 F.2d 1176, 1181 (D.C.Cir.1978), said that "once a certified representative has determined to gain membership approval before it accepts a

---

court indicated that the contract they negotiated on behalf of all of the unit employees was nevertheless valid and binding on the employer. *Id.* at 1183.

Standard Fittings has cited no case in which an employer has been permitted unilaterally to abandon an established bargaining relationship because of its belief that a union is not representing employees properly. To the extent the company claims that its unilateral modification of the collective bargaining agreement was on behalf of employees deprived of fair representation, it has assumed the role of "vicarious champion of [some of] its employees, a role no one has asked it to assume." *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 301 (9th Cir.1978). The company's adoption of this role runs counter to the purposes of the NLRA. As noted by the Supreme Court in *Brooks v. NLRB*, 348 U.S. 96, 103, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954),

The underlying purpose of the statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to industrial peace, it is inimical to it. Other recourse is available to any employees who believe that their rights have been violated by irregular or unlawful internal union procedures. *NLRB v. M & M Oldsmobile, Inc.*, 377 F.2d 712, 717 (2d Cir.1967); *Martin J. Barry Co.*, 241 N.L.R.B. 1011, 1013 n. 5 (1979).

9. Bargaining directly with the employees and ignoring the union is a specific violation of the NLRA, the provisions of which designate the union as the exclusive bargaining agent of the employee unit and require the employer to negotiate with that union. NLRA §§ 8(a)(5) and 9(a); *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 682–85, 64 S.Ct. 830, 832–834, 88 L.Ed. 1007 (1944) (bypassing an exclusive bargaining agent to negotiate directly with employees violates the employer's duty to bargain collectively with the chosen representative of the employees); *Cagles, Inc. v. NLRB*, 588 F.2d 943, 948–49 (5th Cir.1979) (the prohibition on direct negotiation prevents employers from evading their duty to bargain collectively regarding proposed con-

tract modifications by seeking the consent of individual unit employees); *Rath Packing Co.*, 275 N.L.R.B. 255 (1985). In *J.I. Case v. NLRB*, 321 U.S. 332, 337, 64 S.Ct. 576, 580, 88 L.Ed. 762 (1944), the Supreme Court established that individual contracts could not be used "to limit or condition the terms of the collective bargaining agreement" and held that such direct negotiation with the employees, ignoring the duly certified bargaining representative, was a violation of the employer's duty to bargain with the union.

10. In *Letter Carriers*, the court distinguished a local referendum to choose between alternative leave provisions in the executed national contract from the type of contract ratification vote involved in the instant case; the court expressly noted that a contract ratification procedure restricted to union members "is consistent with negotiation of a tentative contract by the bargaining agent, acting in a representative capacity, and with observance of the duty of fair representation." That is the instant case. As the NLRB had noted in *Letter Carriers*,

This is *unlike the ratification of an otherwise agreed-upon contract*, in which the required ratification is an integral part of the union's representation process, and thus *an internal union matter properly determinable by union members alone....* Here, in contrast, the voting ... became a substitute for negotiation and thereby eliminated from the situation the union representation element, and with it the propriety of limiting to union members a voice in the choice.

*Letter Carriers*, 232 N.L.R.B. 263, 268 n. 1 (1977), *enf'd*, 595 F.2d 808 (D.C.Cir.1979) (emphasis added). Perhaps if Standard Fittings and the union had agreed to a referendum on whether the employees wanted reduced hours or deferral of the 35–cent increase, the *Letter Carriers* case would be apposite. However, that is not what developed here, and so the comments in both opinions reveal that *Letter Carriers* does not advance the company's case, but, indeed, cuts against it.

contract, it must accord the opportunity to vote equally to all unit members [or it] fails to represent them fairly," the Supreme Court recently observed in *NLRB v. Financial Institution Employees*, 475 U.S. 192, 205, 106 S.Ct. 1007, 1015, 89 L.Ed.2d 151 (1986), that the NLRA permits union members to make many decisions affecting the employment rights of non-member unit employees. "[T]he Act allows union members to control the shape and direction of their organization and '[n]on-union employees have no voice in the affairs of the union.'" *Id.* (quoting *NLRB v. Allis Chalmers Manufacturing Co.*, 388 U.S. 175, 191, 87 S.Ct. 2001, 2012, 18 L.Ed.2d 1123 (1967)). The Court specifically cited the right to "ratify a collective-bargaining agreement or select union officers and bargaining representatives" as examples of internal union matters concerning which non-union employees may be excluded from voting. 475 U.S. at 205.

Where the employer in *Childers Products Co.*, 276 N.L.R.B. 709, 710–11 (1985), *enf'd mem.*, 791 F.2d 915 (3d Cir.1986), had accepted the union's proposal "subject to ratification," but did not discuss the meaning of this phrase, "the method of ratification was within the [u]nion's exclusive domain and control," and the employer had no standing to question the union's internal procedure.[11] Neither could Standard Fittings have insisted to impasse that the union change either Article III, section 5 of its constitution (which does not permit non-union members to vote) or the procedure for the proposed postponement's ratification (which was to be in accord with the union constitution). *NLRB v. Cheese Barn, Inc.*, 558 F.2d 526, 529–31 (9th Cir. 1977) (citing cases).

Consequently, the Board's view here, that neither member nor non-member employees of Standard Fittings ever had a legal right to vote on union proposals, is absolutely correct. The inclusion of a right to ratification created only a contractual right. There is no claim—and no evidence—that the union ever agreed that non-members had a right to vote on its proposal. And Standard Fittings could do no more than request alternate ratification procedures. The union was free to condition its response to the company's needs however it desired, if it wished to negotiate at all.

Standard Fittings has committed unfair labor practices in refusing to bargain with the union and in appealing directly to its workers. The petition of Standard Fittings for review of the NLRB's order is therefore DENIED, and the Board's order is hereby ENFORCED.

11. *See American Seating Co.*, 176 N.L.R.B. 850, 855 (1969), *enf'd*, 424 F.2d 106, 108 (5th Cir. 1970) (employer impermissibly intruded into internal affairs of union by insisting on membership ratification of contract proposal). *See also Newton Corp.*, 280 N.L.R.B. 38, 122 L.R.R.M. 1227, 1229 (1986), *enf'd*, 819 F.2d 677, 678 (6th Cir.1987) (*per curiam*); *Adams Potato Chips, Inc. v. NLRB*, 430 F.2d 90, 92 n. 1 (6th Cir.1970).