IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

NO. 93-4961
_____

BLUE CIRCLE CEMENT COMPANY, INC.,

Petitioner-
Cross-Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-
Cross-Petitioner.

_____

Petitions for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board
_____

(December 14, 1994)

Before WISDOM and JONES, Circuit Judges, and FITZWATER,[*] District Judge.

FITZWATER, District Judge:

       We are asked to set aside a decision of the National Labor Relations Board ordering

relief for an employee found to have been suspended and discharged in violation of § 8(a)(1)

of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1).  See Blue Circle

Cement Co., 311 N.L.R.B. 623, 624-25 (1993).  The Board, supported by the employee's

union and its local as intervenors, cross-applies for enforcement of the order.  The principal

question presented is whether there is substantial evidence to support the Board's

determination that the employee was engaged in protected concerted activity within the

_____

       [*]District Judge of the Northern District of Texas, sitting by designation.

meaning of § 7 of the Act, 29 U.S.C. § 157. Applying, as we must, a deferential standard of review, we find no basis to disturb the Board's decision. We therefore deny the petition for review and enforce the Board order.

I

Petitioner Blue Circle Cement Company, Inc. ("Blue Circle") suspended and then discharged Stephen Saunders ("Saunders") from employment at its Tulsa, Oklahoma plant after the operations manager discovered Saunders using a company photocopier to duplicate an article on "sham recycling" produced by the environmental organization Greenpeace. See Blue Circle Cement Co., 311 N.L.R.B. at 623 n.6 & 623-24. The incident occurred at a time when Blue Circle was attempting to obtain regulatory approval to burn hazardous waste to fuel its Tulsa plant cement kiln. Id. at 623, 627-28.

Saunders was a member of the United Cement, Lime, Gypsum & Allied Workers Division, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO ("Boilermakers International") and its Local D421 ("Local D421"). He was also Local D421's environmental officer and was a founder and member of Earth Concerns of Oklahoma ("ECO"), a volunteer, nonprofit environmental organization. Id. at 623. "Saunders was concerned that heavy metals in hazardous waste would be released to the atmosphere by the burning of hazardous waste in Blue Circle's kiln." Id. at 631 (footnote omitted). The Greenpeace article that Saunders was discharged for duplicating addressed the topic of toxicological properties of heavy metals. Id. at 623, 631.

Blue Circle terminated Saunders on the ground that he had used company equipment and materials, on paid time, to work against the company's legitimate business interests. Id. at 624. Boilermakers International and Local D421 filed an unfair labor practice charge with the Board, contending Blue Circle had disciplined Saunders for engaging in concerted

- 2 -

protected activities, in violation of § 8(a)(1).[1]  Id. at 627.  A three-member panel of the Board--with one member dissenting--adopted the ALJ's recommendation, finding that Saunders' use of the photocopier was protected concerted activity, rather than personal conduct.

Blue Circle challenges the Board order on the basis of two overarching premises.  It contends, first, that it did not commit an unfair labor practice by suspending and terminating an employee who used the company's photocopier, on company time, to duplicate anti-company materials for distribution to non-employees who opposed Blue Circle's waste fuel recycling proposal.  Blue Circle argues, second, that the remedy of reinstatement and backpay ordered by the Board is inappropriate in the case of an employee found to have given false testimony before the Board.

These dual propositions are supported by the underlying contentions that the Board's General Counsel did not prove that Saunders was engaged in protected activity within the scope of § 7 of the Act; the ALJ and Board reached an erroneous result by failing to focus on the purpose of Saunders' photocopying activity; the Board improperly held disloyal actions to be protected; and the order of reinstatement and backpay should be vacated because Saunders lied under oath at the administrative hearing.  The Board cross-applies for enforcement of its order.

## II

Blue Circle first contends the General Counsel did not sustain his burden of proving by a preponderance of the evidence that Saunders was engaged in a protected concerted activity, within the meaning of § 7, when he was photocopying the Greenpeace article.  The company argues that the ALJ's findings demonstrate this failure of proof because the ALJ determined inter alia that it was "entirely possible that, as Saunders copied the pages, his

---

[1]The union and its local also alleged that Blue Circle had violated § 8(a)(3) of the Act. The ALJ rejected the § 8(a)(3) charge.  See 311 N.L.R.B. at 635.  This claim is not now before us, and we do not discuss it further.

focus was on ECO concerns," Blue Circle Cement Co., 311 N.L.R.B. at 633, and "that Saunders was making the copies to provide to persons who had no direct connection with Blue Circle," id. at 636, and the Board recognized that Saunders intended the materials for ECO and not for officers of Local D421, id. at 624. The company argues there is no evidence that Saunders was engaged in activity for anyone other than himself and ECO when he was using the photocopier, and the General Counsel could not have proved that Saunders was exercising § 7 rights.

Blue Circle also posits that the union had adopted a bargaining position that supported the company's waste fuel proposal; therefore, Saunders' conduct can properly be viewed as an effort to supplant the union's position as exclusive bargaining representative, and thus unprotected by the Act.

A

We consider initially Blue Circle's assertion that the General Counsel did not meet his burden of proof.

1

Section 7 of the Act guarantees an employee the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) protects the employee's right to engage in concerted activities by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7]." 29 U.S.C. § 158(a)(1). To establish a violation of § 8(a)(1) in a discharge case, the General Counsel must prove that the discharged employee was engaged in protected activity. NLRB v. Brookshire Grocery Co., 919 F.2d 359, 363 (5th Cir. 1990).

We review Blue Circle's evidentiary challenge to the Board's decision to "determine whether the underlying findings of fact are supported by substantial evidence on the record considered as a whole." NLRB v. Motorola, Inc., 991 F.2d 278, 282 (5th Cir. 1993) (citing

- 4 -

29 U.S.C. § 160(e); NLRB v. Powell Elec. Mfg. Co., 906 F.2d 1007, 1011 (5th Cir. 1990); Standard Fittings Co. v. NLRB, 845 F.2d 1311, 1314 (5th Cir. 1988)).  Under the substantial evidence standard of review, "the ALJ's decision must be upheld if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion had the matter been presented to it in the first instance."  Standard Fittings, 845 F.2d at 1314.  We are bound by the credibility choices of the ALJ unless the choice is unreasonable or contradicts other findings of fact, or the credibility choice is based on an inadequate reason or no reason at all.  See Motorola, 991 F.2d at 282.  We will "defer to plausible inferences [the ALJ] drew from the evidence, even though we might reach a contrary result were we deciding this case de novo."  Id. at 283 (quoting Cooper Tire & Rubber Co. v. NLRB, 957 F.2d 1245, 1255 (5th Cir. 1992)).

2

The ALJ was unable to determine from the evidence either Saunders' purpose for making the photocopies, or precisely to whom Saunders intended to give the copied pages. Blue Circle Cement Co., 311 N.L.R.B. at 633.  The ALJ expressly rejected, as not credible, Saunders' testimony that he was duplicating the article to give it to Local D421's other officers.  Id. at 635-36.  The ALJ found "that Saunders was making the copies to provide to persons who had no direct connection with Blue Circle."  Id. at 636.  Based on other evidence, which we discuss below, the ALJ made the following findings:  (1) the photocopies were part of a publication aimed at preventing cement companies from burning hazardous waste as fuel in their kilns; (2) all of Saunders' relevant activities concerning cement companies' use of hazardous waste "were aimed specifically at preventing Blue Circle from burning hazardous waste;" (3) Local D421 opposed Blue Circle's plan, and its opposition stemmed at least in part from a concern about the effect of emissions on the health of company employees; (4) Saunders believed Blue Circle's use of hazardous waste as a fuel would be harmful to his health and to the health of his co-workers and nearby

- 5 -

residents; (5) Local D421 appointed Saunders as its environmental officer; and (6) the union deliberately sought to enlist the support of nearby residents and the public to fight the company's plan. Id. at 633.

On the basis of the record evidence, the ALJ concluded the photocopying activity was protected concerted conduct. His reasoning followed two routes. First, the ALJ held that "no matter to whom Saunders intended to give the copies, Saunders surely made the copies to further his opposition to Blue Circle's plan to burn hazardous waste." Id. at 633. His use of the company photocopier "was the `logical outgrowth' of earlier activities that plainly were protected by Section 7," including Local D421's opposition to Blue Circle's plan to burn hazardous waste, the union's efforts to involve the public in its opposition, and the union's "appointment of Saunders as its point man in the fight against [Blue Circle's] plan." Id. at 633-34 (citing Mike Yurosek & Son, Inc., 306 N.L.R.B. 1037, 1038 (1992), for the proposition that the Board will find that individual action is concerted where the evidence supports the finding that the concerns expressed by the individual are the logical outgrowth of concerns expressed by the group).

The ALJ reasoned, second, that because Local D421 had appointed Saunders "to lead the fight against Blue Circle's plan to use hazardous waste," Saunders had made the copies in furtherance of his opposition to the plan, and Saunders' was concerned about the impact of burning hazardous waste on the health of Blue Circle's employees, "all efforts by Saunders to prevent [Blue Circle] from putting its plan into effect prima facie constituted concerted protected activity." Id. at 634. The ALJ concluded that Blue Circle was obligated to overcome this prima facie showing, but did not do so. Id.

The ALJ recognized that "[b]oth of these routes presume that an employee's activity may be protected even if a reason--or, indeed, the main reason--that the employee engaged in it had nothing to do with the mutual aid or protection with which Section 7 is concerned." Id. He determined, however, "that the purposes of the Act would be better fulfilled if an

- 6 -

activity is deemed protected so long as one of the reasons the employee engaged in the activity was for mutual aid or protection (and the activity otherwise would be found to be protected)." Id.

The Board adopted the ALJ's recommendation that Blue Circle be found to have violated § 8(a)(1). Id. at 624-25. The Board majority agreed with the ALJ that Saunders was engaged in concerted rather than personal activity. The Board held that Local D421's "strategic efforts were broad in scope and encompassed enlisting support from the local community, including ECO and other environmental groups, to oppose [Blue Circle's] plan." Id. at 624. Saunders' duties and activities in opposing the plan "were intimately connected to, and derived from, the Union's broad-based strategic efforts." Id. "As a practical matter, therefore, Saunders' efforts on behalf of the Union and on behalf of ECO, in opposing [Blue Circle's] plan, were virtually inseparable." Id. The Board disagreed with Blue Circle's assertion that Saunders' "activity was entirely personal and not in any way connected with the Union" because "as the [ALJ] found, the actions in question were a logical outgrowth of the multiple efforts of Saunders and [Local D421] to oppose [Blue Circle's] plan to burn hazardous waste." Id. The Board found it immaterial in the context of the facts before it that the photocopied materials were intended for persons having no direct connection with Blue Circle--i.e. ECO--because this endeavor was "yet another form of concerted activity undertaken for the purpose of protecting the health and safety of those affected by [Blue Circle's] plan, including, of course, the health and safety of his fellow bargaining unit employees most directly affected by the plan." Id.

3

Applying, as we must, the deferential substantial evidence standard of review, we hold that the General Counsel met his burden of proving that Saunders' photocopying was a concerted protected activity. Although our decision in this case may approach--if it does not reach--the outer limits of putatively individual conduct that we will uphold as concerted

activity, we conclude from the record as a whole that a reasonable person could have found as did the ALJ.

Local D421 became concerned about Blue Circle's plan to burn hazardous waste as fuel in its Tulsa plant kiln. Id.[2] Officials of the local jointly concluded they did not want the company to effect the plan. Id. Because of this concern and based upon Saunders' interest in environmental matters, the local appointed Saunders--a clerk-typist at the Tulsa plant and an "ardent environmentalist"--as its environmental officer. Id. ECO, which Saunders had helped create and operate, opposed Blue Circle's intentions to use hazardous waste as fuel. Id. Officials of the local were concerned that this would have a detrimental impact on the health of plant employees. Id. at 628-29. The union president decided that Local D421 should actively oppose Blue Circle's plan. Id. at 629. One of the first actions that the local's president undertook was to appoint Saunders to the post of environmental officer. Id.

Saunders concluded the company's plan should be challenged because it would cause health problems for anyone exposed to air that contained emissions of chemicals from the kiln. Id. He opposed the plan "doing so both as the Union's environmental officer and as a member of and a spokesman for ECO." Id. Saunders researched hazardous waste burning by cement plants. One of his principal research sources was the Greenpeace article on "sham recycling" of hazardous waste by cement plants. Saunders determined how Blue Circle employees felt about the company's plan. At each union meeting, beginning in January 1991, he discussed his views of the dangers of burning hazardous waste. Saunders also organized opposition to Blue Circle's plan among residents of communities located nearby

---

[2]The ALJ recognized that the union and its employees "viewed opposing the Company's hazardous waste plan as a way to put pressure on . . . Blue Circle to increase wages and the like and as a way to attract the public's attention to the employees' economic grievances." Blue Circle Cement Co., 311 N.L.R.B. at 629. The ALJ also found, however, that "there is also no doubt that Local D421's position was that Blue Circle should not use hazardous waste as fuel for its kiln and that the Union's officers and at least some Blue Circle employees were concerned about what they perceived to be the health hazards of hazardous waste burning." Id.

the plant. Id. As Saunders fought Blue Circle on this matter, he fulfilled two different roles and wore two hats: one was that of Local D421's environmental officer; the other was that of ECO activist and spokesman. Id.

Saunders and other union officers organized a rally near the plant to publicize the company's waste-burning plan as well as the union's contract dispute with the company. Id. During a pre-rally meeting with the Tulsa plant manager, union officials voiced total opposition to the plan. Id. The rally was attended by Blue Circle employees and family members, residents of nearby communities (whom Saunders had encouraged to attend), and members of the media (to whom Saunders had publicized the rally). Id. The union instructed picketers to focus on usual labor issues, but also advised participants that it desired to inform the public of Blue Circle's hazardous waste plan and of the possible health consequences. Saunders drafted handbills that Blue Circle employees distributed at the rally. These expressed concern about economic issues but also addressed "health care needs resulting from hazardous waste burning." Id. A member of Local D421's negotiating committee who spoke to reporters referred to the waste burning issue and how it might affect the worker. A picket sign written by Saunders and carried at the event referred to the union as being "against pollution." Id.

Following this rally, union members engaged in several months of informal picketing before work and during lunch. Id. at 630. Picket signs addressed the hazardous waste issue as well as the usual contract issues. Id. Saunders was among the most frequent members of the picket line. Id. A second rally was also conducted within two weeks of the first. Id. Saunders' role in the subsequent event was similar to his role in the first. Id.

After Blue Circle formally submitted its hazardous waste proposal to the Environmental Protection Agency ("EPA"), the Local D421 negotiating committee distributed to Tulsa plant employees a letter, drafted by Saunders, expressing the union's

concern regarding the company's proposal and enclosing pages from the Greenpeace publication on "sham recycling." Id.

The union thereafter staged another rally similar to the two conducted earlier, with Saunders again actively involved as an organizer and spokesman to the media. A handout drafted to publicize the rally referred to requests by ECO, Boilermakers International, and Local D421, among others, that citizens "join in a demonstration in solidarity with workers and residents threatened by hazardous waste burning." Id.

Saunders was later terminated from employment at Blue Circle after he was discovered making the photocopies in question.

We conclude from the record that the Board's finding that Saunders was engaged in concerted protected activity when he was making the photocopies in question is supported by substantial evidence. Therefore, regardless whether we might prefer the dissenting member's analysis of the evidence to the majority view, we hold that the General Counsel sustained his burden of proof.

B

Blue Circle also contends the Board order must be set aside because the union adopted a bargaining position in support of Blue Circle's plan to use hazardous waste to fuel its kiln. Blue Circle relies upon evidence in the administrative record that representatives of Boilermakers International stated during bargaining sessions that the union would not oppose burning hazardous waste, so long as it was done according to EPA regulations. It contends the union realized the importance of burning waste fuels, and that one of Boilermaker International's representatives stated that the union recognized the company and union must pull together to make the plan successful, and offered to help the company obtain EPA approval.

The Board implicitly adopted the ALJ's finding that "Saunders' efforts to prevent [Blue Circle] from burning hazardous waste were in support of the Union's position, not

contrary to it." 311 N.L.R.B. at 635 (ALJ finding); see id. at 623 n.1 (Board decision). The ALJ agreed with Blue Circle that during a two-day negotiating session in June 1991, negotiators for Boilermakers International "seemed to support the Company's use of hazardous waste as fuel (subject to certain conditions)." Id. at 634. He nevertheless found that Blue Circle employees opposed the plan for a considerable period of time, both before and after the negotiating session; that the union never agreed to the company's use of hazardous waste as fuel; and both prior to and after Saunders' discharge, the union opposed the plan. Id. at 634-35. The ALJ therefore determined that the position taken by Boilermakers International "was a temporary one . . . stemming from the identity of the persons negotiating on behalf of the Union." Id. at 635. Except for this occasion, the union consistently opposed the plan. Id.

We conclude that these findings are supported by substantial evidence. We reject Blue Circle's attempt to set aside the Board order on this basis.

III

Blue Circle next argues that the ALJ and the Board failed to focus properly on the purpose of Saunders' photocopying activity.

A

Blue Circle asserts that because § 7 only protects activities that are for the purpose of mutual aid or protection, "[t]he purpose of the activity is crucial in evaluating whether it is protected." Pet. Br. at 22. Blue Circle urges that the ALJ and the Board "erroneously focused on the photocopying activity itself rather than the purpose behind the photocopying," id., and thereby "ignored the possibility of disparate purposes behind Saunders' various activities and the legal relevance of the objective of a certain activity." Id. at 22-23.

We confess some difficulty discerning what Blue Circle means by the concept of improperly focusing on the "photocopying activity itself." We do not find from our review of the record that the Board attached especial significance to the activity of photocopying as

being particularly indicative of concerted protected activity.  There is no suggestion that the

ALJ and Board viewed this type of conduct as inherently concerted or presumptively

undertaken for mutual aid and protection.  Blue Circle appears to be asserting that the Board

and ALJ uncritically accepted that photocopying an article on "sham recycling" and the

toxicological properties of heavy metals was simply another of the myriad activities that

Saunders had undertaken in support of his union's opposition to the company plan, without

adequately considering the possibility that Saunders had a different--and entirely personal--

purpose on this occasion.

We disagree that the ALJ and Board improperly disregarded the purpose for the

photocopying.  Both the ALJ and the Board addressed this very issue.  The ALJ found that at

least one of the reasons Saunders had engaged in the activity was for mutual aid and

protection.  See Blue Circle Cement Co., 311 N.L.R.B. at 633-34.  The Board similarly held

that Saunders' purpose was to achieve the union goal of opposing and stopping Blue Circle's

plan. Id. at 624.  These findings are supported by substantial evidence.  We decline to set

aside the Board order on this ground.

B

Blue Circle also argues, on the basis of our decision in Motorola, 991 F.2d 278, that

Saunders' status as an employee did not give him the right to advance the objectives of ECO,

an outside organization, in the workplace.  The company maintains that the ALJ and the

Board have apparently taken the position, contrary to Motorola, that the inclusion of a

workplace issue (use of hazardous wastes) in ECO's agenda cloaks with the protection of § 7

of the Act all of Saunders' activities at the Blue Circle plant taken on ECO's behalf.  Because

we find Motorola distinguishable and disagree with Blue Circle's characterization of the

Board's holding, we decline to accept this argument.

In Motorola we refused to enforce a portion of a Board decision and order holding

that an employer's ban on distribution of literature on its property, by employee-members of

- 12 -

an outside organization opposed to mandatory drug testing in the workplace, violated § 7. See Motorola, 991 F.2d at 285. We held that the purpose for the distribution of the literature was to advance the organization's political agenda and therefore was not protected activity. The employees in Motorola specifically stated that they did not represent other employees in their opposition to their employer's actions, and that they did not have any goal of changing the employer's policies. Id. They intended instead to encourage employees to contact their legislators and urge them to pass an ordinance banning mandatory drug testing in the workplace. Id. at 284. Further, the outside organization controlled the distribution of the literature. Id. at 285.

We were concerned in Motorola that the effect of the Board's order would be to "authorize any political splinter group with employee members to disseminate literature at the workplace as long as the group's agenda includes some issue relevant to that workplace." Id. We therefore held that employees acting as members of an outside political organization cannot demand the same § 7 rights as employees in collective bargaining or self-representation in disputes with management simply because the outside organization is concerned with a workplace issue. Id.

In the present case, by contrast, all of Saunders' activities, whether taken on behalf of the union and/or ECO, in opposing the Blue Circle plan to burn hazardous waste were directly aimed at changing his employer's policy on this issue. Saunders' opposition to the Blue Circle plan was supported by Local D421 and Blue Circle employees. The employees were attempting to change Blue Circle's plan to burn hazardous waste. The action at issue was not initiated solely by an outside organization as was the case in Motorola, but rather by Saunders while "wearing two hats." He undertook "virtually inseparable" activities on behalf of both ECO and Local D421. Motorola does not support Blue Circle's position.

IV

Relying on <u>NLRB v. Local Union No. 1229, Int'l Bhd. of Elec. Workers</u>, 346 U.S. 464 (1953), Blue Circle next argues that the Board improperly held Saunders' disloyal actions to be protected.

In <u>Local No. 1229</u> the Supreme Court placed limits on § 7 protected activity by affirming the Board's decision to uphold the discharge of television station technicians who distributed handbills severely criticizing the quality of the company's programming. The employees initiated the attack "in a manner reasonably calculated to harm the company's reputation and reduce its income." <u>Id</u>. at 471. Although the activity occurred during an ongoing labor dispute, the disparaging handbills made no reference to wages, hours, working conditions, or any pending labor dispute. The employees omitted any reference to the labor controversy. Instead, the handbills were simply an attack upon the employer "made in the interest of the public rather than in that of the employees." <u>Id</u>. at 477.

Blue Circle argues that Saunders' conduct was more egregious than was the employees' conduct in <u>Local No. 1229</u> because not only did Saunders allege that Blue Circle's burning of hazardous waste would endanger public safety, he did so on company time using the company's photocopier. We disagree.

Saunders' opposition to the waste burning plan was not simply a malicious attack upon Blue Circle's product in order to extract concessions from Blue Circle. According to the Board's findings, the opposition in the present case arose out of concern on the part of Local D421, ECO, their respective members, and the surrounding community for the health and safety of Blue Circle employees.[3] The activities at issue did not disparage Blue Circle's product or reputation. Unlike the station technicians' actions in <u>Local No. 1229</u>, those who opposed the waste-burning plan did seek community support. At all times, during rallies and picketing, opposition to the plan was voiced in conjunction with the ongoing labor dispute.

---

[3]<u>See</u> <u>supra</u> at note 2 (discussing ALJ's recognition that the union and Blue Circle employees had mixed motives for opposing the company's plan to burn hazardous waste as fuel).

- 14 -

Saunders' activities were directly related to employee interest in health and safety.  <u>Local No. 1229</u>'s limitation on activities protected by § 7 is therefore inapposite.

V

Blue Circle maintains finally that the Board's order of reinstatement and backpay should be vacated because Saunders lied under oath regarding his purpose for using Blue Circle's photocopier.  In light of <u>ABF Freight Sys., Inc. v. NLRB</u>, ___ U.S. ___, 114 S.Ct. 835 (1994), decided after Blue Circle filed the instant petition for review, we find no basis to set aside the order.

*  *  *

Blue Circle's petition for review of the Board order is DENIED.  The Board's cross-petition for enforcement is granted and the order is hereby ENFORCED.