Filed 8/4/16  County of Tulare v. California Public Employment Relations Board CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## N THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| COUNTY OF TULARE,<br><br>      Petitioner,<br><br>            v.<br><br>CALIFORNIA PUBLIC EMPLOYMENT RELATIONS BOARD,<br><br>      Respondent;<br><br>SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>      Real Party in Interest. | F071240<br><br>(PERB Dec. No. 2414-M,<br>Case No. SA-CE-748M)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REQUESTS FOR PUBLICATION**<br><br>**[NO CHANGE IN JUDGMENT]** |

It is hereby ordered that the opinion filed herein on July 11, 2016, be modified as follows:

1.  On page 34, correct the numbered heading to read as follows:

**IV.      Discussion of Vested Rights**

Except for the modification set forth, the opinion previously filed remains unchanged.  This modification does not effect a change in the judgment.

In addition, the requests for publication of the opinion filed in the above entitled matter are hereby denied.  The opinion does not establish a new rule of law, nor does it meet any of the other criteria set forth in California Rules of Court, rule 8.1105(c).

In compliance with California Rules of Court, rule 8.1120(b), the Clerk/Administrator of this court shall transmit copies of the requests for publication, the opinion, and this order to the Supreme Court.

HILL, P.J.

WE CONCUR:

LEVY, J.

GOMES, J.

2.

Filed 7/11/16  County of Tulare v. California Public Employment Relations Board CA5 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| COUNTY OF TULARE,<br><br>Petitioner,<br><br>v.<br><br>CALIFORNIA PUBLIC EMPLOYMENT RELATIONS BOARD,<br><br>Respondent;<br><br>SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>Real Party in Interest. | F071240<br><br>(PERB Dec. No. 2414-M,<br>Case No. SA-CE-748-M)<br><br><br>**OPINION** |

ORIGINAL PROCEEDING; PETITION FOR WRIT OF EXTRAORDINARY RELIEF.

Kathleen Bales-Lange, County Counsel, Jennifer M. Flores, Deputy County Counsel; Renne Sloan Holtzman Sakai, Charles D. Sakai and Erich W. Shiners for Petitioner.

Patrick Whitnell and Corrie L. Manning for League of California Cities and California State Association of Counties as Amicus Curiae on behalf of Petitioner.

J. Felix De La Torre, Wendi L. Ross, Laura Z. Davis and Daniel M. Trump for Respondent.

Weinberg, Roger & Rosenfeld, Anne I. Yen and Kerianne R. Steele for Real Party in Interest.

-ooOoo-

In this writ proceeding, County of Tulare (County) challenges the decision of the California Public Employment Relations Board (the Board), which concluded County committed an unfair practice by repudiating its obligations under two addenda to the 2009 Memorandum of Understanding (MOU) between County and the employee organization representing five bargaining units of its employees. County contends the Board misinterpreted the addenda, erroneously determined County waived its right to implement its final offer after reaching impasse in negotiating a successor MOU because of the executory obligations imposed by the addenda, and erroneously concluded the employees had a vested right to future promotions and salary increases. We deny the petition for a writ, but modify the Board's decision to exclude the discussion of vested rights, which is inaccurate in the context of the questions presented in this proceeding.

### *FACTUAL AND PROCEDURAL BACKGROUND*

County is a public agency subject to the Meyers-Milias-Brown Act. (Gov. Code, § 3500 et seq.; MMBA.) Service Employees International Union Local 521 (Union) is a recognized employee organization representing five bargaining units of employees of County. (Gov. Code, § 3501, subd. (b).) County and Union agreed to an MOU that provided it was effective August 1, 2009 to July 31, 2011 (2009 MOU). Because of County's financial situation at the time, in the 2009 MOU, Union agreed to concessions in salaries and promotions. Two addenda to the 2009 MOU are in issue in this case. Addendum B provided that personnel rule 3.1.1 was suspended "for all classifications within a flexibly allocated class series for the term of the contract." A flexibly allocated classification is a job classification in which there are multiple levels, beginning with an entry level and moving up to more experienced levels. Promotion from one level to

2.

another results in a salary increase. Addendum C provided that "merit or step increases will be suspended for the term of the contract." Employee performance was evaluated annually; employees achieving a high enough rating on their evaluations would be moved up a step within their classification. The effect of these two addenda was to freeze promotions and salary increases during the term of the 2009 MOU.

In 2011, the parties met to negotiate a successor MOU. Because County was facing a deficit of up to $4.6 million, County's initial proposal included a continuation of the freeze on promotions and salary increases. Union's position was that, after expiration of the 2009 MOU, the employees it represented were entitled to be moved up in accordance with the promotions or step increases earned during the term of the 2009 MOU.[1] Its position was based on language of the two addenda. After providing for a freeze of promotions, addendum B provided: "Commencing the first full pay period following the expiration of the agreement each employee having qualified during the term of the agreement for promotion to a higher classification in a flexibly-allocated classification will be placed at the step in that classification which in the absence of this provision would have taken effect during the agreement." After freezing step increases, addendum C provided: "Commencing the first full pay period following the expiration of the agreement each employee having qualified during the term of the agreement will be placed at the step in the range which in the absence of this provision would have taken effect during the agreement." Each of County's 2014 proposals included a continued freeze of promotions and step increases.

The parties could not reach agreement on a successor MOU; County declared an impasse and its Board of Supervisors elected to implement County's final offer, including the continued suspension of promotions and salary increases. Union filed an unfair

---

[1] Union sought only prospective salary increases. It did not seek backpay for the period during which the 2009 MOU was in effect.

practice charge with the Board, alleging County repudiated the terms of the two addenda, which contractually obligated County to give effect to promotions and step increases earned, but suspended, during the term of the 2009 MOU. The Office of the General Counsel issued a complaint against County, alleging County committed an unfair practice by refusing to implement addenda B and C to the 2009 MOU.

The matter was heard by an administrative law judge, whose proposed decision was in favor of County. Union filed a statement of exceptions to the proposed decision, and County filed a response. The Board issued its decision in favor of Union. County filed its petition for a writ of extraordinary relief with this court, seeking a writ directing the Board to vacate its decision and enter a new order dismissing the complaint and the unfair practice charge against County. Alternatively, County seeks a writ directing the Board to vacate the portions of its decision discussing constitutionally vested rights. Amici curiae, League of California Cities and California State Association of Counties, urge this court to hold that a local public agency's waiver of the right to implement the terms of its final offer must be "clear and unmistakable"; they also join County in urging this court to direct the Board to exclude from its decision the discussion of vested and constitutionally protected rights.

## *DISCUSSION*

### I.       **Standard of Review**

The Board processes charges of unfair practices brought under the MMBA. (Gov. Code, § 3509, subd. (b).) "Any charging party, respondent, or intervenor aggrieved by a final decision or order of the board in an unfair practice case … may petition for a writ of extraordinary relief from that decision or order." (Gov. Code, § 3509.5, subd. (a).) The petition must be filed in the court of appeal. (Gov. Code, § 3509.5, subd. (b).) "The court shall have jurisdiction to … make and enter a decree enforcing, modifying, and enforcing as modified, or setting aside in whole or in part the decision or order of the

4.

board.  The findings of the board with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, shall be conclusive." (*Ibid.*)

"PERB is 'one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect.' [Citation.]  '[T]he relationship of a reviewing court to an agency such as PERB, whose primary responsibility is to determine the scope of the statutory duty to bargain and resolve charges of unfair refusal to bargain, is generally one of deference' [citation], and PERB's interpretation will generally be followed unless it is clearly erroneous." (*Banning Teachers Assn. v. Public Employment Relations Board* (1988) 44 Cal.3d 799, 804.)  "'It is, however, "the duty of this court, when … a question of law is properly presented, to state the true meaning of the statute … even though this requires the overthrow of an earlier erroneous administrative construction."'" (*Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 587.)

When the meaning of an MOU is in dispute, we apply de novo review, unless the interpretation turns upon the credibility of extrinsic evidence.  (*National City Police Officers' Assn. v. City of National City* (2001) 87 Cal.App.4th 1274, 1278.)  "When the competent parol evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 (*Winet*).)

## II.     Interpretation of MOU

### A.     *Contract interpretation*

"The MMBA requires the public agency and employee organization to 'meet and confer in good faith' [citation], and when an agreement is reached it must be reduced to a written MOU and presented to the governing body for determination.  [Citation.]  Once

approved by the agency's governing body, the MOU becomes a binding agreement and must be interpreted by the same rules as apply to other public or private contracts." (*Social Services Union v. Alameda County Training & Employment Bd.* (1989) 207 Cal.App.3d 1458, 1465.)

"Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822.)

The Board's interpretation of the language of the addenda is consistent with the clear and explicit meaning of the words used, construed in their ordinary and popular sense. Addendum B states in its entirety:

> "Effective August 2, 2009 suspend Personnel Rule 3.1.1 for all classifications within a flexibly allocated class series for the term of the contract. Exceptions to this suspension of the rule may be made by the County Administrative Officer on a case by case basis. Commencing the first full pay period following the expiration of the agreement each employee having qualified during the term of the agreement for promotion to a higher classification in a flexibly-allocated classification will be placed at the step in that classification which in the absence of this provision would have taken effect during the agreement. Further the eligibility date for the subsequent step or promotion in a flexibly-allocated classification, if any, will be set up in the payroll system on the date, which in the absence of this provision would have taken effect during the agreement. Nothing herein precludes the rights of the County not to grant such a promotion or step increase as set forth in the Personnel Rules and regulations."

According to the plain meaning of this provision, employees who qualified for a promotion during the term of the 2009 MOU "will be placed" in the higher classification

6.

commencing the first full pay period after expiration of that MOU.  The addendum uses the mandatory term "will," rather than the permissive or discretionary term "may."  (See *Jones v. Catholic Healthcare West* (2007) 147 Cal.App.4th 300, 307 ["[c]ourts routinely construe the word 'may' as permissive"]; *Compton College Federation of Teachers v. Compton Community College Dist.* (1982) 132 Cal.App.3d 704, 711 [contrasting "permissive words such as 'may' … with mandatory words such as 'will,' 'shall' and 'must'"]; see also *International Brotherhood of Electrical Workers, Local 1245 v. City of Redding* (2012) 210 Cal.App.4th 1114, 1117 [construing MOU provisions that "'City will pay'" 50 percent of its retirees' medical insurance premiums and that this provision "'will remain in full force and effect, unless modified by mutual agreement'" as binding, enforceable promises that gave rise to vested rights in the retirees].)

The provision that employees otherwise entitled to promotions "will be placed" in the higher classification expresses a binding, enforceable promise.  The promise is not conditioned on any improvement in County's finances prior to the date of performance, or on the results of any future MOU negotiations.  It is a clear and unqualified promise, accompanied by a specified time for performance.  Additionally, the addendum provides that eligibility for future promotions, after those implemented in the first pay period after expiration of the 2009 MOU, will be based on the date on which the promotion would have taken effect in the absence of the freeze.

Addendum C states:

"Effective August 2, 2009, merit or step increases will be suspended for the term of the contract.  During the contract period the County will track and identify the dates on which merit increases would normally be received.  Commencing the first full pay period following the expiration of the agreement each employee having qualified during the term of the agreement will be placed at the step in the range which in the absence of this provision would have taken effect during the agreement.  Further the eligibility date for the next step, if any, will be set up in the payroll system on the date, which in the absence of this provision would have taken effect during the agreement.  Nothing herein precludes the rights of the County

7.

not to grant a merit increase as set forth in Rule 4 of the Personnel Rules and regulations."

The plain meaning of this provision is that, during the term of the 2009 MOU, County was required to track the dates on which merit increases would normally have been received. Then, in the first pay period after expiration of the 2009 MOU, employees "will be placed" at the step in the range they would have achieved in the absence of the freeze. Thus, after expiration of the 2009 MOU, County was required to place employees who qualified for step increases during the term of the agreement at the steps for which they qualified. Additionally, County was required to set up its payroll system to reflect the date on which the merit increase would normally have taken effect, to use in determining eligibility for subsequent increases.

We conclude the Board correctly interpreted the addenda, in accordance with the plain and ordinary meaning of the language used, as requiring County to move all eligible employees to the steps or levels within their classifications to which they would have been moved during the term of the MOU in the absence of the freeze, commencing the first full pay period after expiration of the 2009 MOU.

### B.     *Extrinsic evidence*

"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." (Civ. Code, § 1639.) The parol evidence rule generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument. (*Alling v. Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1433.) It "establishes that the terms contained in an integrated written agreement may not be contradicted by prior or contemporaneous agreements." (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 344 (*Casa Herrera*).)

Extrinsic evidence, however, may be admitted to aid in interpreting a contract when its language is ambiguous. (*Winet*, *supra*, 4 Cal.App.4th at p. 1165.) "The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.' [Citation.] [¶] The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract." (*Ibid*.) "Extrinsic evidence is thus admissible to interpret the language of a written instrument, as long as such evidence is not used to give the instrument a meaning to which it is not reasonably susceptible." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912, fn. omitted.) The first step of the test, whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible, is a question of law subject to de novo review. (*Winet,* at p. 1165.)

> **1.     The extrinsic evidence was not relevant to prove a meaning to which the language of the addenda was reasonably susceptible.**

County has not proposed an interpretation of the actual language of the addenda contrary to the interpretation offered by Union and adopted by the Board. Without reference to any particular language, County has taken the position that the addenda only required County to keep track of accrued promotions and step increases so they could be credited to employees if and when the freeze was lifted. The language of the addenda on its face is not susceptible to the interpretation offered by County.

Addendum B contained no language regarding keeping track of promotions and increases so they could be credited to employees later. Rather, it provided that, at the

9.

specified time, "each employee having qualified during the term of the agreement for promotion to a higher classification in a flexibly-allocated classification will be placed at the step in that classification which in the absence of this provision would have taken effect during the agreement." That language is not reasonably susceptible to an interpretation that County agreed only to track eligibility for promotions and step increases to take effect at some undefined future date.

Addendum C states: "During the contract period the County will track and identify the dates on which merit increases would normally be received." If that were County's only promise, the language would be susceptible to the interpretation County advocates. But addendum C also contains language similar to that of addendum B: at the specified time, "each employee having qualified during the term of the agreement will be placed at the step in the range which in the absence of this provision would have taken effect during the agreement." Again, the language is not reasonably susceptible to an interpretation that County agreed only to track eligibility for promotions and increases to take effect at some undefined future date.

"Courts must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative or meaningless." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473–474.) County's proposed interpretation of the addenda completely disregards the crucial language promising that employees would receive the promotions or step increases for which they qualified during the term of the 2009 MOU, commencing the first full pay period after expiration of the MOU. County's interpretation renders that provision nugatory, inoperative and meaningless.

The extrinsic evidence offered by County in support of its interpretation of the addenda language did not prove a meaning to which the language was reasonably susceptible. County relied on the testimony of Greg Gomez, a member of the team that negotiated the 2009 MOU on behalf of Union. It focused on Gomez's testimony that

10.

Union "wanted clear language that put the pressure on the County to maintain tracking of how people were going to be or should have been promoted during that period of time," and Tim Huntley, the chief negotiator for County, responded there was a mechanism to track promotions and step increases without implementing them.

Parol evidence of a prior or contemporaneous oral agreement is not admissible to vary or contradict the terms of a written agreement. (*Casa Herrera*, *supra*, 32 Cal.4th at p. 344.) Thus, evidence that the parties discussed some other arrangement before executing the written agreement was not admissible to contradict the terms of the written contract. Additionally, "[p]arol evidence is admissible only to prove a meaning to which the contractual language is 'reasonably susceptible'; not to flatly contradict the express terms of the agreement." (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 379 (*Consolidated World*).) County's proposed interpretation of the addenda as promising only that County would track promotions and step increases, and not that it would terminate the freeze, would flatly contradict the plain meaning of the express language used in the addenda. Thus, the Board correctly determined County's extrinsic evidence was not admissible to show that the addenda had a meaning contrary to what their plain language expressed.

### 2. If considered, the extrinsic evidence supported the Board's interpretation of the addenda.

Although the Board found County's extrinsic evidence was not admissible, it also determined that the extrinsic evidence of the parties' bargaining history actually supported Union's interpretation of the addenda. To the extent extrinsic evidence was admitted at the hearing before the administrative law judge, and was considered by the Board in reaching its decision, the Board's decision in favor of Union was supported by substantial evidence on the record considered as a whole. "'The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.… [A] reviewing court is not barred from setting aside a Board decision when it cannot

11.

conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" (*George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1980) 111 Cal.App.3d 258, 265.)[2]

Gomez testified that, when negotiations for the 2009 MOU began, Union understood County anticipated a significant reduction in revenue and expected financial concessions in the agreement. County proposed one year of concessions, but Union offered a two-year contract. Union made clear, however, that at the end of those two years, it wanted the employees who had given up promotions and step increases to be made whole; by "made whole," it meant everyone would move up to where they should have been, to the steps they would have received during the freeze. Other unions were negotiating at the same time; Union was the only one that offered a two-year freeze on promotions and step increases, so County agreed, as a reward, to the language of the addenda. Gomez testified that, during bargaining sessions, Union expressed its desire for assurances that, at the end of the two years, employees would get their promotions and step increases back; Huntley affirmed that.

County contends the Board misinterpreted Gomez's testimony. It focuses on the testimony concerning County tracking the promotions and step increases that would have been granted in the absence of the freeze. County asserts "PERB strain[ed] its interpretation of Gomez's testimony to mean exactly what he declined to say under oath – that the County promised restoration of the promotions and increases." But County's argument ignores other portions of Gomez's testimony. Gomez stated multiple times that, during negotiation of the 2009 MOU, Union made clear to County that it would

---

**2**    The court in *George Arakelian Farms* made this statement in its discussion of federal cases interpreting the National Labor Relations Act (29 U.S.C. § 151 et seq.; NLRA). NLRA cases are persuasive authority for interpreting similar provisions of the MMBA. (*County of Los Angeles v. Los Angeles County Employee Relations Com.* (2013) 56 Cal.4th 905, 919.)

agree to a two-year freeze, but at the end of the two years, the employees had to be made whole. He stated: "[T]here were discussions going back and forth. … [W]hat would it look like? … [W]e know that you want some kind of assurances that everyone will be made whole at the end of those two years, so what would it look like? And this was … what they passed to us across the table."

Additionally, Gomez testified:

"Q But nobody from the County ever said that no matter what happens with the economy in 2011 these will be granted?

"A I believe he did at one point.

"Q Who's he?

"A Tim Huntley.

"Q And did Tim Huntley say that directly to you?

"A In open session, in a bargaining session. He wouldn't have said it that way. He said it more general and that he agreed with us. We reiterated. I mean this didn't just happen in one meeting. There were a couple of meetings where we told him, you know, we want assurances that at the end of those two years we will get our step increases and we will get our merits back. And he reaffirmed that.

"Q But he did not say that it would happen no matter what?

"A I don't believe so."

Thus, the testimony was that, although Huntley did not use the language "it would happen no matter what," he agreed with Union and reaffirmed to it that, at the end of the two-year term of the MOU, the employees would get their promotions and step increases back. Gomez clarified that Union did not expect retroactive payment of the increases for those two years, but only that employees would wind up on the step they should have been on. The language of the addenda was what County proposed to Union to accomplish that. The testimony at the administrative hearing supports the Board's interpretation of the addenda as requiring County to move employees into the

13.

classification levels and steps they would have achieved during the term of the 2009 MOU in the absence of the suspension of promotions and step increases.

County also argues that the economic situation in 2009 and 2011 and Union's conduct during the 2011 negotiations demonstrated that the parties did not intend the addenda to guarantee that promotions and step increases would be restored after expiration of the 2009 MOU. The testimony at the hearing indicated the parties were well aware of the economic situation when they negotiated the 2009 MOU and the addenda to it. Nonetheless, the provisions they drafted and agreed to, embodied in addenda B and C, contained express promises to place employees at the steps and classifications at which they would have been placed during the term of the MOU in the absence of the suspension of promotions and step increases. Extrinsic evidence cannot be used to flatly contradict the express terms of the agreement. (*Consolidated World*, *supra*, 9 Cal.App.4th at p. 379.)

County contends the 2011 negotiations demonstrate "*both* parties considered future merit-based promotions and salary increases to be negotiable, not guaranteed." County's initial proposal in 2011 included a continuation of the suspension of promotions and step increases. Union initially proposed that the step increases be restored effective July 31, 2011, and a new sixth step be added. It made no proposal regarding promotions, merely indicating the issue needed more discussion. Union later proposed giving employees the promotions and steps they would have received during the 2009 MOU, and then refreezing promotions and step increases.

Gomez testified that Shelline Bennett, the lead negotiator for County in 2011, asked several times what Union thought would happen at the end of the term of the 2009 MOU; each time Union reasserted that the language was clear and everyone had to be made whole, had to come up to where they should have been. Regarding why Union's initial proposal indicated County's proposal regarding promotions needed more discussion, Gomez stated: "[W]e were trying to reach a mutual agreement that would be

14.

in the best interests of both the County and the Union. Everything was up for discussion. We were trying to maybe see if there was a way we could save the County money. I think I testified that at one time we had offered the County maybe you only give us one step and not both of them, or you know, maybe there's different ways that we can work this out." The language "need more discussion" merely meant Union wanted to continue bargaining over this item.

Gomez further testified that Union's position throughout the 2011 negotiations was that the employees would get the steps they were owed. It made proposals that would have absolved County from some of its obligations; the sense at the bargaining table was that County did not have a lot of money, but at the same time it had a contractual obligation it needed to live up to. There was room for movement, but County kept saying "no."

At the meeting of the Board of Supervisors on July 26, 2011, when the Board approved implementation of County's final offer, Gomez spoke to the Board. He reasserted the Board needed to fulfill its contractual obligation and give employees their step increases, and told them implementing County's final offer was a mistake.

Thus, even if the Board considered the extrinsic evidence offered at the hearing, in addition to the plain language of the addenda to the 2009 MOU, its construction of the language of addenda B and C, and its implied findings as to the mutual intent of the parties, were reasonable and supported by substantial evidence on the record considered as a whole.

### 3. Other extrinsic evidence

County contends other provisions in the 2009 MOU indicated the parties did not intend addenda B and C to create a contractual right to restoration of promotions and step increases effective after the 2009 MOU expired, without regard to whether County's economic situation had improved by 2011. County refers to articles 43 and 69 of the 2009 MOU. County did not raise this argument at the hearing before the administrative

15.

law judge or in its arguments to the Board. "As a general rule, a party is precluded from urging on appeal any point not raised in the trial court. [Citation.] Any other rule would ""'permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not.'"'" (*In re Riva M.* (1991) 235 Cal.App.3d 403, 411–412.) We believe the same rule is appropriate when the court, by writ proceeding, reviews an adjudication by a trial court or administrative agency.

Even if we were to consider County's argument on the merits, however, we would reject it. Article 43 of the 2009 MOU authorized either party to renegotiate the provisions of that MOU after one year, by giving notice to the other party at least 90 days before July 31, 2010. It stated: "The intent of this Article shall not be to replace any Addendums, Side Letters, or other attachments to this agreement, but such attachments may be modified to reflect the economic circumstances during the term of this Agreement." There is no evidence either party exercised its right under this article to renegotiate addendum B, addendum C, or any other provisions of the MOU during the term of the agreement. Article 43 evinces an intent to allow a mid-term renegotiation of the MOU and its addenda if the economic situation changed during the term of the MOU. Because the opportunity to reopen bargaining during the term of the MOU was not exercised, the addenda and the obligations they imposed remained unaltered. Article 43 says nothing about the substance of addendum B or addendum C, when or how they were to be performed, or what was to happen after expiration of the 2009 MOU.

Article 69 of the 2009 MOU provides: "In the event … employee layoffs become necessary during the term of this agreement, the County will meet and confer over the impacts of the layoffs. The County reserves the right to make and consider alternative proposals to reduce costs to lessen the severity of the layoffs." This provision also pertains to circumstances occurring "during the term of this agreement," which

apparently did not occur. It reflects County's legal (not merely contractual) obligation to meet and confer over the effects of layoffs before implementing them. (See *Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 634 (*Claremont*).) It says nothing about addendum B or addendum C, nothing about promotions or step increases, and nothing about what is to happen after expiration of the MOU.

County argues these articles indicate the parties understood the County's precarious financial situation, and it would be "incongruous" and "absurd" for the parties to agree to allow renegotiation of terms and consideration of alternatives to layoffs during the term of the MOU, but not allow renegotiation of the termination of the freeze on promotions and step increases, which it describes as an alternative to layoffs, in the process of negotiating a successor MOU. Whether it is incongruous or absurd or not, the language of the addenda is clear. We cannot rewrite the parties' agreement in the guise of interpreting it. (*Rodriguez v. American Technologies, Inc*. (2006) 136 Cal.App.4th 1110, 1122 ["While we may question the wisdom of the parties' choice,… the parties were free to choose their [contractual provisions]. The court will not rewrite their contract"]; *Wyandotte Orchards, Inc. v. Oroville-Wyandotte Irrigation Dist*. (1975) 49 Cal.App.3d 981, 986–987 ["the courts cannot rewrite a contract to avoid difficulty or hardship"].)

County also complains the Board "completely ignored the language of the Personnel Rules themselves, language which shows that merit-based promotions and salary increases are conditional, not absolutely guaranteed." It is not surprising the Board did not analyze the language of the personnel rules, considering neither party presented those rules to the Board or placed them in evidence at the hearing before the administrative law judge. County has requested that we take judicial notice of the personnel rules, since they are not included in the record before us. We deny that request.

17.

We reiterate that a party is generally precluded from urging in this court any point not raised below. (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.) "However, 'a litigant may raise for the first time on appeal a pure question of law which is presented by undisputed facts.'" (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959.) Whether we consider the question is a matter within our discretion. (*Resolution Trust Corp. v. Winslow* (1992) 9 Cal.App.4th 1799, 1810.) We decline to do so here, because it is far from clear this issue is purely legal. If the issue had been raised before the administrative law judge, the parties would have had the opportunity to present extrinsic evidence concerning their intent in referring to the personnel rules in addenda B and C, as well as extrinsic evidence concerning the meaning of the personnel rules and how they have been applied in the past. In the absence of such an opportunity, it would be inequitable for us to rule on the issue as if the facts were not in dispute and the question was purely one of law.

## III.    MMBA Violation

The Board interpreted the provisions of the 2009 MOU and its addenda because this was necessary in order to determine whether County committed an unfair practice, in violation of the MMBA, by unilaterally changing its policy regarding promotions and step increases; Union alleged County made a unilateral change by repudiating its contractual obligation and refusing to implement the provisions of addenda B and C of the 2009 MOU. The Board analyzed the plain meaning of the language of addenda B and C, and concluded it was "sufficiently clear to establish an enforceable promise that, on the date specified, the County would restore the flex promotions and merit step increases provided for by its Personnel Rules and place SEIU-represented employees at the steps in the classification and pay ranges that employees would have attained had the parties not agreed to suspend flex promotions and merit step increases during the 2009-2011 MOU." It also found that, even if it considered extrinsic evidence, the result would be the same.

18.

We agree with the Board's interpretation of the terms of the MOU and its addenda. The next question is whether the Board correctly determined County violated the MMBA by unilaterally changing its policy on promotions and step increases when it repudiated the addenda and refused to implement the accrued promotions and step increases commencing the first pay period after expiration of the 2009 MOU, and instead insisted that all promotions and step increases were subject to negotiation in bargaining for a successor MOU in 2011.

## A. Rules governing collective bargaining

The MMBA governs collective bargaining between public employers and their employees. (*San Bernardino Public Employees Assn. v. City of Fontana* (1998) 67 Cal.App.4th 1215, 1220 (*Fontana*).) It imposes on the governing body of a public agency and the bargaining representative of the employees a duty to "meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of … recognized employee organizations," and to "consider fully such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action." (Gov. Code, § 3505.) The parties must "meet and confer … to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year." (*Ibid.*) The parties "are not required to reach an agreement because the employer has 'the ultimate power to refuse to agree on any particular issue.'" (*Claremont, supra*, 39 Cal.4th at p. 630.) They must, however, make a genuine effort to reach agreement. (*Ibid.*)

If the parties bargain to agreement, the agreement reached, once ratified by the public employer, is binding. (Gov. Code, § 3505.1; *Glendale City Employees' Assn., Inc. v. Glendale* (1975) 15 Cal.3d 328, 336 (*Glendale*).) "An MOU is binding on both parties for its duration." (*Fontana, supra*, 67 Cal.App.4th at p. 1220.) During the term of the MOU, neither party can be compelled to renegotiate the terms contained in the MOU.

19.

"[T]he terms of a collective bargaining agreement, once agreed upon, 'constitute a waiver for the term of the agreement of the right to bargain over issues expressly covered therein.'" (*Fountain Valley Elementary School Dist.* (1987) PERB Dec. No. 625 [11 PERC ¶ 18115, p. 23] (*Fountain Valley*).)  An employer violates its statutory obligation when it "seeks to modify during the life of an existing contract terms and conditions of employment embodied in the contract and made effective for its term.…  [A] bargain having already been struck for the contract period and reduced to writing, neither party is required under the statute to bargain anew about the matters the contract has settled for its duration, and the employer is no longer free to modify the contract over the objection of the Union."  (*Id*. at pp. 26–27.)

If the parties do not reach agreement, "'[t]he duty to bargain requires the public agency to refrain from making unilateral changes in employees' wages and working conditions until the employer and employee association have bargained to impasse.'" (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71–72.) Thus, when an MOU expires, the employer cannot unilaterally change its employees' wages, hours, or other terms and conditions of employment; it must meet and confer with the union representing the employees until the parties reach agreement or impasse.  When the parties have reached impasse, and complied with any impasse resolution procedures, the public agency may implement its last, best, and final offer.  (Gov. Code, § 3505.7.) Until impasse is reached, however, the employer must maintain the status quo and cannot unilaterally change the employees' wages, hours, or other working conditions.  (*San Joaquin County Employees Assn. v. City of Stockton* (1984) 161 Cal.App.3d 813, 818–819.)

The subjects on which the parties are required to bargain before the employing public agency may implement its final offer are referred to as mandatory subjects of bargaining.  Under the MMBA, the parties are required to bargain "regarding wages, hours, and other terms and conditions of employment."  (Gov. Code, § 3505.)  Matters

20.

not falling within these categories are nonmandatory or permissive subjects of bargaining.**3** (*South Bay Union School Dist. v. Public Employment Relations Bd.* (1991) 228 Cal.App.3d 502, 505, fn. 4 (*South Bay*); *City of Glendale* (2012) PERB Dec. No. 2251-M [36 PERC ¶ 157, pp. 13–14].)

Nonmandatory subjects of bargaining are not required by the MMBA to be negotiated between the public employer and the employees' bargaining representative. Although the parties are not required to negotiate them, they may bargain over them and include them in their MOUs by mutual agreement. (*City of San Jose, supra,* PERB Dec. No. 2341-M at p. 43.) "However, an employer may not insist on acceptance of a proposal containing a permissive subject of bargaining over a 'clear and express refusal by the union to bargain' over the matter." (*Ibid.*)

As to permissive subjects, "each party is free to bargain or not to bargain, and to agree or not to agree." (*NLRB v. Wooster Div. of Borg-Warner Corp.* (1958) 356 U.S. 342, 349.) "Since a party has no absolute right to negotiate concerning a 'nonmandatory subject of bargaining,' it has no prerogative of continuing the bargaining to the point of impasse and no proper election to declare impasse [on the nonmandatory subject]. A declaration of impasse with respect to an issue which is a 'nonmandatory subject of bargaining,' therefore, is an unfair labor practice." (*South Bay*, *supra*, 228 Cal.App.3d at p. 505, fn. 4.) Further, "conditioning mandatory subjects of bargaining on resolution of

---

**3**     "The category 'non-mandatory' subjects includes both 'permissive' subjects and 'illegal' or 'prohibited' subjects." (*City of San Jose* (2013) PERB Dec. No. 2341-M at p. 43 <http://www.perb.ca.gov/decisionbank/pdfs/2341M.pdf> [as of Jun. 22, 2016] (*City of San Jose*).) Illegal subjects involve matters prohibited by external law or public policy. They are nonnegotiable; they cannot be included in an MOU and may not serve as the lawful basis for a declaration of impasse or be imposed by the employer on reaching impasse. (*Id*. at pp. 43–44.) There is no suggestion in this case that the parties bargained over any illegal subjects. Accordingly, the term "nonmandatory" as used herein refers only to permissive subjects of negotiation.

nonmandatory subjects … is a per se unfair practice." (*Lake Elsinore School Dist.* (1986) PERB Dec. No. 603 [11 PERC ¶ 18022, pp. 5–6].)

"Negotiating over a non-mandatory subject does not convert it to a mandatory subject, nor does it oblige the party who has begun so negotiating to continue." (*Berkeley Unified School Dist*. (2012) PERB Dec. No. 2268 at p. 13 <http://www.perb.ca.gov/decisionbank/pdfs/2268E.pdf > [as of Jun. 22, 2016].) "[E]ven at impasse, an employer may not impose proposals on non-mandatory subjects or which conflict with statutory rights of employees or of the union." (*Id*. at p. 12.)

Nonmandatory subjects include matters the parties have already agreed to in their MOU. In *Fountain Valley*, the school district and the employees' union were parties to a collective bargaining agreement that was effective from July 1, 1982 through June 30, 1985. (*Fountain Valley, supra*, PERB Dec. No. 625 [11 PERC ¶ 18115, p. 2].) The agreement allowed reopening during its term on the issues of salary and calendar only. During the term of the agreement, legislation was enacted, offering additional revenue to districts that increased their instructional minutes and days. (*Id*. at p. 3.) The school district could not qualify without increasing the instructional minutes for grades 1 and 2. (*Id*. at pp. 3–4.) When the union submitted a salary proposal pursuant to the reopener language, the school district sought to renegotiate instructional minutes, although the existing agreement specified the number of instructional minutes applicable during the term of the agreement. (*Id*. at pp. 2–4.) The union was unwilling to renegotiate instructional minutes, and rejected the school district's offers. (*Id*. at pp. 4, 29.) When the parties reached impasse on the salary issue, the school district unilaterally adopted an increased number of instructional minutes for grades 1 and 2. (*Id*. at p. 4.) The union filed an unfair practice charge based on the unilateral changes. (*Id*. at p. 5.)

The Board analyzed the issues under the Educational Employment Relations Act (Gov. Code, § 3520, et seq.; EERA), which contains provisions similar to those of the MMBA and is also administered by the Board. (Gov. Code, §§ 3541, 3541.3.) It

22.

concluded the school district violated the EERA by unilaterally changing the instructional minutes. (*Fountain Valley, supra*, PERB Dec. No. 625 [11 PERC ¶ 18115, pp. 9–10].)

The school district argued it had not violated the EERA because it gave the union notice and an opportunity to negotiate changes in instructional minutes before it implemented its proposal, but the union refused to bargain in good faith. *Fountain Valley, supra*, PERB Dec. No. 625 [11 PERC ¶ 18115, pp. 3, 5].) The Board rejected that argument. "[A]n employer's unilateral action on a matter within the scope of representation is a per se violation of the EERA." (*Id.* at p. 17.) Changes in instruction time were within the scope of representation. (*Id*. at p. 18.) The changes made by the school district constituted a repudiation of the contract. (*Ibid*.) Collective bargaining agreements are binding on both the employer and the union; "a charging party establishes a violation of the EERA if it proves that an employer breached or otherwise altered a collective bargaining agreement and that the breach amounted to a change of policy that had a generalized effect or continuing impact upon the terms and conditions of employment of bargaining unit members." (*Id.* at p. 19.) Because agreement to a collective bargaining agreement constitutes a waiver for the term of the agreement of the right to bargain over the issues contained in it, the union had no duty to renegotiate instructional minutes, and it refused to do so. (*Id*. at p. 23.) The Board noted: "[O]ur responsibility in administering EERA is to make it possible for the parties to negotiate collective bargaining agreements in good faith and, once they have done so, to protect their right to rely on their agreements." (*Id.* at p. 8.) The union was entitled to rely on the negotiated agreement. (*Ibid*.)

Federal cases have reached the same result in situations arising under the NLRA. (*Standard Fittings Co. v. NLRB* (5th Cir. 1988) 845 F.2d 1311, 1315; *St. Barnabas Medical Center* (2004) 341 NLRB 1325.) In *Standard Fittings*, the court stated: "Section 8(d) of the NLRA prohibits either party from insisting upon a modification of the agreement during its term. While a contract is in force, section 8(d) permits the union

23.

to refuse, even unreasonably, an employer's proposal to modify the terms established by the collective bargaining agreement. [¶] The union thus need not assent to proposed changes in the contract, no matter how necessary to the survival of the enterprise. The result may be harsh, but the law is clear that a party may not escape its obligations under a collective bargaining agreement because of financial difficulties." (*Standard Fittings Co. v. NLRB*, at p. 1315.)

Further, in the absence of a reopener clause, if the employer proposes that the parties reopen negotiations during the contract term on matters covered in the contract, and the union agrees to discuss, or even renegotiate, the matters, the employer is not authorized to unilaterally implement its proposal if the parties fail to reach an agreement. "There is certainly nothing to support [the employer's] thesis that, once having agreed to listen to [the employer] or even to 'renegotiate,' the agreement became a nullity and that [the employer] was free to comply with it or violate it, at its pleasure. To find that, once the Union agrees to listen to and to talk about mid-term modifications, it waives all its rights under a written collective-bargaining agreement, would forever deter any labor organization from talking about any changes, no matter what the circumstances, and would destroy even the possibility of discussing an employer's financial difficulties." (*Herman Brothers, Inc*. (1984) 273 NLRB 124, 126 (*Herman Brothers*).) "[A]lthough an employer may unilaterally institute changes when an impasse occurs during the negotiations for an initial bargaining agreement or following the expiration date of an expiring contract, the employer may not do so where, as here, the contract has not yet terminated." (*Id*. at p. 127.)

Thus, the parties' collective bargaining agreement is binding and, in the absence of a provision for reopening the matters in issue, the agreed upon terms cannot be changed unilaterally while the agreement is still in effect. This is true even if the parties voluntarily agree to discuss or renegotiate changes during the term of the agreement. An

agreement to discuss modifications of the terms while the agreement is still in effect does not abrogate the existing terms of the agreement.

These cases demonstrate that, once the parties have agreed on an MOU and it is ratified by the public agency employer, it is binding and enforceable; the employer commits an unfair practice if it unilaterally changes the terms contained in the MOU while those terms remain in effect. Terms that address mandatory subjects of bargaining can be changed after expiration of the MOU, if the employer gives the union notice and an opportunity to negotiate new terms. The terms may be changed by the parties mutually agreeing to a successor MOU; alternatively, the employer may implement its final offer after the parties' negotiations toward a successor MOU have reached impasse.

Negotiating and including terms relating to nonmandatory subjects of bargaining is voluntary. Either party may decline to bargain over nonmandatory subjects, even if those subjects were included in the expiring MOU. The employer cannot insist on including nonmandatory subjects in the negotiations and cannot impose terms relating to them on the union after impasse as part of implementation of its final offer.

### B. *Effect of timing of performance of obligations in the addenda*

County seems to argue that the promises made in the addenda expired along with the rest of the MOU on July 31, 2011. Therefore, in negotiating a successor MOU, County was free to bargain for the continuation of the suspension of promotions and step increases; further, because promotions and compensation are mandatory subjects of negotiation, if the parties did not agree and reached impasse, County could unilaterally implement its final offer.

The Board rejected County's argument that negotiations for the 2011 MOU superseded the provisions of the 2009 addenda, permitting County to bargain the continued freeze on promotions and step increases to impasse then implement its final offer on that subject. The Board observed that, once ratified, the terms of the MOU were fixed for the duration of the agreement; the parties could neither repudiate the promises it

contained nor accept the benefits of the agreement, but reject less favorable provisions that were intrinsic to the bargain. (See *Glendale*, *supra*, 15 Cal.3d at p. 336.) The Board concluded "the impasse rule is subject to any outstanding contractual obligations the employer may have incurred." It found "nothing in the language or purpose of MMBA section 3505.7 to suggest that the right to impose terms at impasse in successor negotiations authorizes the employer to disregard any outstanding contractual obligations under its previous agreement, simply because those obligations do not mature until after the agreement has expired." We conclude the Board's interpretation of the MMBA was not clearly erroneous. It correctly determined County's preexisting contractual obligation imposed by addenda B and C precluded County from renegotiating the termination of the freeze on promotions and step increases when it bargained for a successor MOU in 2011, and from implementing at impasse an offer that included a provision for continuation of that freeze.

Generally, "legislation in California may be said to create contractual rights when the statutory language or circumstances accompanying its passage 'clearly "… evince a legislative intent to create private rights of a contractual nature enforceable against the [governmental body]."' [Citation.] … Where, for example, the legislation is itself the ratification or approval of a contract, the intent to make a contract is clearly shown." (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1187 (*Retired Employees*).) The 2009 MOU and its addenda took the form of a contract, which was approved by County's Board of Supervisors. Thus, the intent to create contractual rights is clear.

Article 50 of the 2009 MOU provided: "The provisions of this MOU commenced on August 1, 2009 and shall remain in effect until July 31, 2011." Addenda B and C, however, provided that promotions and step increases were to be suspended effective August 2, 2009, and, "[c]ommencing the first full pay period following expiration of the agreement," employees "will be placed" at the step the employee would have reached

26.

during the term of the MOU in the absence of the suspension.  Thus, while the main portion of the MOU was to remain in effect only until July 31, 2011, the obligations imposed by the addenda were expressly to be performed "following the expiration of the agreement."

The whole contract must be interpreted together, and must be given "such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."  (Civ. Code, §§ 1643, 1641.)  County's interpretation of the addenda as not surviving expiration of the MOU would render the promises expressed in the addenda illusory; that is, the obligations would have expired before the time set for their performance.  In keeping with our duty to construe the contract so as to make its provisions operative, reasonable, and capable of being carried into effect, we must construe the specific provisions of the addenda—that they will be performed following expiration of the agreement—as exceptions to the general provision that the MOU was to remain in effect until July 31, 2011.  This interpretation is consistent with the intent expressed in the language of the addenda, that the suspension of promotions and step increases would last for the term of the MOU, then end the first pay period after expiration of the MOU.

Thus, we conclude addenda B and C imposed binding contractual obligations County expressly agreed to perform during the first pay period after expiration of the 2009 MOU.  Further, because these were binding contractual obligations, already bargained for in connection with the 2009 MOU, they were nonmandatory subjects of bargaining in the 2011 MOU negotiations.

Considerable confusion was engendered in this case by the terminology used by the parties, the administrative law judge, and the Board.  They referred to the addenda as imposing "future rights"; they discussed whether and when the employees' rights thereunder "matured," "accrued," or "vested," or whether they "survived expiration" of the MOU.  We believe the situation was more accurately described by the Board when it

27.

referred to the obligations imposed by the addenda as "executory contractual obligations arising from a prior agreement" and "outstanding contractual obligations the employer may have incurred."

Obligations imposed by a collective bargaining agreement may be set for performance at a time independent of and after expiration of the main agreement; they remain binding even after expiration of the main agreement. In *United Steelworkers of America v. Fort Pitt Steel Casting* (3d Cir. 1979) 598 F.2d 1273 (*United Steelworkers*), paragraph 140 of the parties' collective bargaining agreement provided that "in the event of a labor dispute at the end of termination of this Agreement, The Company will continue hospitalization and insurance benefits"; at the end of the dispute, the employer was to be reimbursed for its payments. (*Id*. at p. 1276.) After the collective bargaining agreement terminated and the parties were unable to negotiate a new agreement, the employees went on strike. The employer unilaterally implemented its proposal for a new agreement, which allowed it to terminate the insurance premium payments after 30 days. The trial court subsequently held the employer in contempt for violating an injunction requiring it to continue paying the premiums necessary to keep the insurance policies in effect. (*Id*. at pp. 1276–1277.)

Reviewing the contempt order, the court concluded the impasse doctrine permitted the employer to unilaterally implement its own proposal only when it was not bound by contrary provisions that had already been agreed upon by the parties. (*United Steelworkers*, *supra*, 598 F.2d at p. 1281.) Paragraph 140 of the agreement was still operative. "That paragraph did not even take effect until the rest of the 1975 Agreement had expired and the labor dispute had begun, and did not lapse, by its terms, until the end of the dispute. Thus, because Fort Pitt had already struck a bargain with the Union on paragraph 140, it was precluded from altering the substance of that bargain, without the Union's approval, during the life of paragraph 140 i.e., until the end of the labor dispute." (*Id*. at p. 1281, fn. omitted.)

28.

In *Meilman Food Industries, Inc*. (1978) 234 NLRB 698, the parties' collective bargaining agreement provided that, "'[i]f as of … November 15 of any year during the life of this agreement the Consumer Price Index'" reached a specified level, "'then effective with the first pay period beginning on or after the following … January 1,'" the employees would receive a cost-of-living increase. (*Id*. at pp. 698, 704, italics omitted.) The agreement expired December 6, 1974. (*Id*. at p. 698.) On November 15, 1974, the Consumer Price Index exceeded the specified level. The NLRB interpreted the cost-of-living provision according to its plain meaning; because the Consumer Price Index exceeded the required level on November 15, 1974, a date within the life of the agreement, the employees were entitled to a cost-of-living increase, payable on January 1, 1975. The employer's refusal to effectuate the increase on that date, based on a claim the agreement had expired, was a unilateral change in the existing wage structure that violated the governing statute. (*Id*. at pp. 698, 705.)

In accordance with these cases we conclude that, when the parties have bargained to agreement, and included in their MOU terms that are to be performed after expiration of the main part of the MOU, those provisions are binding on the parties according to their terms. They do not expire with other obligations under the agreement. Because they are binding terms of the MOU, while the executory obligations remain, those obligations are not mandatory subjects of bargaining for a successor MOU. An MOU is binding on the parties for its duration. (*Fontana*, *supra*, 67 Cal.App.4th at p. 1220.) As to executory obligations, the duration includes the time for performance of those obligations. The employee representative cannot be compelled to renegotiate them; the employer cannot bargain them to impasse, then impose contrary terms as part of implementation of its final offer.

Like the disputed provisions in *United Steelworkers* and *Meilman Food Industries*, the provisions in the addenda to the 2009 MOU for placing the employees at the levels and steps earned during the term of that agreement did not take effect until the rest of the

29.

2009 MOU had expired. The addenda remained operative and executory until the first full pay period after expiration of the MOU, at which time County was required to perform in accordance with them. The fact that the parties had already bargained to agreement on those provisions prevented County from compelling renegotiation when bargaining for a successor MOU. They were nonmandatory subjects of bargaining during the duration of the agreement, which included the duration of the addenda. Because they were not mandatory subjects of negotiation, County could neither compel Union to renegotiate the addenda, nor bargain them to impasse and impose contrary obligations by implementing its final offer.

Repudiating a contractual obligation under the addenda to an MOU while that obligation remains in effect constitutes a unilateral change in terms and an unfair labor practice. (See *Standard Teachers Association* (2005) PERB Dec. No. 1775 [29 PERC ¶ 162, p. 16] ["The repudiation of an agreement … is virtually the definition of an unlawful unilateral change"].) In 2011, County was free to negotiate terms affecting *future* promotions and step increases. It could not, however, bargain from a position that abrogated its existing obligation to grant promotions and step increases immediately after expiration of the 2009 MOU and that assumed County could simply continue the freeze on promotions and step increases.

### C. *Waiver of right to implement final proposal on impasse*

A public agency employer is authorized by statute to implement its last, best, and final offer, after reaching impasse and exhausting any applicable postimpasse procedures. (Gov. Code, § 3505.7.) County argues that it did not waive this statutory right, and so it was not precluded from implementing its final offer, including a provision for continuation of the freeze on promotions and step increases, after reaching impasse in the negotiation of a successor MOU in 2011. County asserts that a waiver, especially of a statutory right, will not be lightly inferred, but must be "clear and unmistakable"; further, the party claiming waiver must show the matter was "fully discussed" and "consciously

30.

explored" and the waiving party "consciously yielded" its interest in the matter. (*Oakland Unified School Dist.* (1982) PERB Dec. No. 236 [6 PERC ¶ 13201]; *Amador Valley Joint Union High School Dist.* (1978) PERB Dec. No. 74 [2 PERC ¶ 2192]; Los Angeles Community College Dist. (1982) PERB Dec. No. 252 [6 PERC ¶ 13241].)

The Board concluded the "clear and unmistakable" standard was met. It held that "parties may expressly agree to limit an employer's right to impose terms at impasse, or they may impliedly achieve the same result by agreeing to terms that do not mature until after the agreement has expired. Accordingly, where, as here, a contractual right survives expiration of the agreement, the employer is not free to impose terms that abrogate or impair that right."

We agree County was not free to impose at impasse in 2011 terms that abrogated its obligations under the addenda to the 2009 MOU. County and amici curiae object to the suggestion that a "clear and unmistakable" waiver of County's right to bargain to impasse and implement its final offer can be implied. Their arguments assume County had a "right" in 2011 to bargain to impasse and implement County's final offer on the subject of termination or continuation of the freeze on promotions and step increases, a right which could only be waived expressly. County seems to assert it had that right because promotions and salary increases are mandatory subjects of negotiation.

While promotions and salary increases in general may be mandatory subjects of negotiation, the timing of termination of the suspension of promotions and step increases, which was determined by the addenda to the 2009 MOU, was not. County had no right in 2011 to implement its final offer on that subject, both because the statutory requirements for implementation never arose and because County clearly and unmistakably waived any such right by entering into a binding, express agreement on the subject in 2009.

When the parties were negotiating in 2009 and 2011, the right of the employer to implement its final offer arose only after the parties met and conferred in good faith,

31.

failed to reach agreement, and exhausted any applicable impasse procedures. (Gov. Code, §§ 3505, 3505.7 [former 3505.4].) Consequently, if the parties reached agreement on terms of an MOU, the employer had no statutory right to implement an offer to which the union did not agree.

The parties negotiated and reached agreement on termination of the freeze on promotions and step increases when they agreed to the 2009 MOU. They memorialized that agreement in addenda B and C to the 2009 MOU. Both parties ratified the agreement. The addenda remained in effect and operative at the time the parties attempted to negotiate a successor MOU in 2011. They imposed an affirmative obligation on County to restore the employees' promotions and step increases in the first pay period after expiration of the MOU. Thus, the statutory prerequisites to a right to unilaterally implement terms governing continuation or termination of the freeze on promotions and step increases were not met in 2011, because the parties had already bargained to agreement on the subject in 2009.

Additionally, the parties' execution and ratification of the 2009 MOU and its addenda clearly and unmistakably waived any right County might otherwise have had to implement at impasse in 2011 a final offer that continued the freeze on promotions and step increases. The terms of the 2009 MOU, including the addenda, "'constitute[d] a waiver for the term of the agreement of the right to bargain over issues expressly covered therein.'" (*Fountain Valley*, *supra*, PERB Dec. No. 625 [1987 Cal. PERB LEXIS 39, p. 23].) The parties having struck a bargain, reduced it to writing, and executed and ratified it, neither party was required by statute to bargain anew about matters the contract had settled for its duration. (*Id*. at pp. 26–27.) The effect of reaching, executing, and ratifying an express and binding agreement covering termination of the suspension of promotions and step increases was a clear and unmistakable waiver by County of its right to renegotiate that subject in 2011 and a corresponding waiver of any right to change the termination date by implementing a final proposal that purported to continue the

32.

suspension during the term of the successor MOU.  In negotiating for a successor MOU in 2011, the starting point for the parties should have been the positions they would have been in after all obligations imposed by the 2009 MOU had been performed.  In other words, they should have begun negotiations with the assumption the promotions and step increases would be awarded in the first pay period of August 2011, consistent with the obligation imposed by the addenda.

Union's proposals in the 2011 negotiations, to the extent they suggested Union might be willing to renegotiate termination of the freeze of promotions and step increases, did not reopen that subject or convert it into a mandatory subject of negotiation.  (*Herman Brothers*, *supra*, 273 NLRB at p. 126.)  They constituted discussion of a nonmandatory subject of bargaining, which could not give rise to a right to implement terms on that subject after impasse.

We emphasize again the limited scope of this decision.  The subject of termination of the 2009 MOU's freeze of promotions and step increases and granting those promotions and step increases was a nonmandatory subject of negotiation in 2011.  It was nonmandatory because the parties had already bargained it to a binding agreement in 2009.  The Board did not, and we do not, hold that because of addenda B and C to the 2009 MOU the subjects of promotions and step increases in general were forever removed from the process of negotiating MOUs.  The only things the parties were precluded from renegotiating, in the absence of a mutual agreement to renegotiate, were the finite promises contained in addenda B and C that, in the first pay period after expiration of the 2009 MOU, employees who had already qualified for promotions or step increases during the term of the 2009 MOU would be placed at the step which they would have reached absent the freeze on promotions and step increases.  County was bound by those express promises.  Our opinion should not be construed as a determination that any other subject, such as future promotions and step increases, is a nonmandatory subject of negotiation.

## III. Discussion of Vested Rights

Before the administrative law judge, Union argued parties can include in an MOU provisions that create obligations that are not to be performed until after the term of the MOU. Before the Board, it maintained this position, citing in support cases discussing vested pension and retirement rights that survive the expiration of an MOU. In its responsive argument before the Board, County argued those cases were not applicable; it described the issue in this case as: "whether an alleged vested right trumps an employer's statutory right under the MMBA to implement its LBFO upon impasse."

Because of these references to "vested" rights, after concluding the addenda imposed binding contractual obligations on County that survived expiration of the remainder of the MOU, the Board included in its decision a section in which it attempted to harmonize its interpretation of the MMBA with the law governing vested rights. A portion of the discussion, however, relied on cases addressing pensions and other longevity based benefits. The Board appeared to conclude this case was governed by the rules applicable to pensions, and therefore the rights claimed by Union were vested and enforceable like pension rights. County and amici curiae object to that discussion, arguing it was not necessary to the Board's decision and the reasoning it contains is flawed. We conclude the contractual obligation in issue in this case is not governed by the rules applicable to pensions, and the Board's attempt to apply those rules to this case was in error.

Generally, "vested" means: "Having become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute." (Black's Law Dictionary (9th ed. 2009) p. 1699, col. 2.) We note that cases have not applied the term in a uniform manner when discussing it in connection with different types of employment benefits.

In *Kern v. City of Long Beach* (1947) 29 Cal.2d 848 (*Kern*), when the petitioner began his employment with the city, the city charter provided that, after 20 years of

34.

service, he would receive a pension equal to 50 percent of his salary. A month before he completed 20 years of service, the city repealed the pension provisions in the city charter, purporting to eliminate pensions for all persons not yet eligible for retirement. The court phrased the issue presented as: "whether petitioner acquired a vested right to a pension which the city could not abrogate by repealing the charter provisions without impairing its obligation of contract." (*Id*. at p. 850.)

Although a public employee has no right to continued employment, "public employment gives rise to certain obligations which are protected by the contract clause of the Constitution, including the right to the payment of salary which has been earned. Since a pension right is 'an integral portion of contemplated compensation' [citation], it cannot be destroyed, once it has vested, without impairing a contractual obligation." (*Kern*, *supra*, 29 Cal.2d at p. 853.) Regarding the time in which a pension right vests, the court stated:

> "It is true that an employee does not earn the right to a full pension until he has completed the prescribed period of service, but he has actually earned some pension rights as soon as he has performed substantial services for his employer. [Citations.] He is not fully compensated upon receiving his salary payments because, in addition, he has then earned certain pension benefits, the payment of which is to be made at a future date. While payment of these benefits is deferred, and is subject to the condition that the employee continue to serve for the period required by the statute, the mere fact that performance is in whole or in part dependent upon certain contingencies does not prevent a contract from arising, and the employing governmental body may not deny or impair the contingent liability any more than it can refuse to make the salary payments which are immediately due. Clearly, it cannot do so after all the contingencies have happened, and in our opinion it cannot do so at any time after a contractual duty to make salary payments has arisen, since a part of the compensation which the employee has at that time earned consists of his pension rights." (*Kern*, at p. 855.)

The fact that a pension right has vested does not prevent its loss by lawful termination of employment before completion of the required period of service; nor does

35.

it prevent subsequent changes in the terms and conditions of the pension, since "[t]he employee does not have a right to any fixed or definite benefits, but only to a substantial or reasonable pension." (*Kern*, *supra*, 29 Cal.2d at p. 855.)

Similarly, in *Betts v. Board of Administration of Public Employees' Retirement System* (1978) 21 Cal.3d 859, the court concluded: "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity." (*Id*. at p. 863.)

Some cases have held that employment benefits based on longevity in employment are also vested rights that may not be impaired. A salary increase at the end of nine, 12, 15, and 18 years of employment, a fifth week of vacation after 10 years of service, and a four-month fully paid sabbatical at the end of each six years of service, which were all provided pursuant to the district's policies and procedures, were held to be forms of compensation earned over time. (*California League of City Employee Associations v. Palos Verdes Library Dist*. (1978) 87 Cal.App.3d 135, 137, 140 (*California League*).) The employer could not simply eliminate them, because "it would be grossly unfair to allow [the employer] to eliminate such benefits and reap the rewards of such long-time service without payment of an important element of compensation for such service." (*Id*. at p. 140.) In *Thorning v. Hollister School Dist*. (1992) 11 Cal.App.4th 1598, the court followed *California League* and found health and welfare benefits for retirees were vested rights that could not be denied to retired public officers who had been in office while the provisions for those benefits were in effect. (*Thoring v. Hollister School Dist.,* at pp. 1605–1609.)

In contrast, in *Fontana*, the court rejected the union's claims that the employees it represented possessed vested, contractual rights to personal leave accrual, longevity pay, and retirement health benefits, which could not be altered through collective bargaining.

36.

(*Fontana, supra*, 67 Cal.App.4th at p. 1218.) These longevity-based benefits had been agreed upon in successive MOUs. In negotiations for a new MOU in 1995, the city proposed reducing the benefits. The court found *California League* unpersuasive and concluded the protection that applied to pension rights did not apply to the longevity-based benefits because the benefits were negotiated periodically under an MOU. (*Fontana,* at pp. 1221–1223.) The MOUs were of fixed duration; once they expired, the employees had no legitimate expectation the benefits included in them would continue unless they were renegotiated as part of a new MOU. (*Id.* at p. 1223.) "The benefits at issue could not have become permanently and irrevocably vested as a matter of contract law, because the benefits were earned on a year-to-year basis under previous MOU's that expired under their own terms." (*Id.* at p. 1224.)

In its decision, the Board broadly overstated the rule derived from cases addressing pensions and longevity-based benefits: "Under California law, an employee acquires an irrevocable or 'vested' interest in a benefit when the employment contract is formed, even if the benefit does not 'mature' until later. A 'statute fixing government payments may amount to an offer which, when accepted by performance, culminates in a contract between the government and the offeree.' [Citation.] Once vested, the right to compensation cannot be reduced or eliminated without unconstitutionally impairing the contract obligation.… Thus, the rules governing the employment contract, on the first day of employment, are protected against changes that detrimentally affect the public employee's 'fundamental' rights, including the right to compensation for services rendered." (Fn. omitted.)

To the extent this language suggests that a public employee's benefits of any type become permanently and irrevocably vested on the day the employee begins performing services for the public employer, it is not an accurate statement of the law. To the extent the Board suggests this rule, derived from cases addressing pension rights and some longevity-based benefits, applies to the issues in this case, it is in error.

The cases discussing pension rights, and stating they vest upon acceptance of employment, generally stress the distinction between pension rights and other employment benefits. In *Miller v. State of California* (1977) 18 Cal.3d 808, a state civil service employee challenged a statutory amendment that reduced the age of mandatory retirement from 70 to 67, asserting it impaired his vested contractual right to qualify for a larger pension by working longer. (*Id.* at pp. 811, 813.) The court rejected the employee's claims: "On the contrary it is well settled in California that public employment is not held by contract but by statute and that, insofar as the duration of such employment is concerned, no employee has a vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law. [Citations.] Nor is any vested contractual right conferred on the public employee because he occupies a civil service position since it is equally well settled that '[the] terms and conditions of civil service employment are fixed by statute and not by contract.'" (*Id.* at p. 813.) Additionally, "[p]laintiff's reliance upon decisions concerning the pension rights of public employees is misplaced. This court has held, as will be explained hereafter, that pension rights involve 'obligations which are protected by the contract clause of the Constitution.' … Pension rights, unlike tenure of civil service employment, are deferred compensation earned immediately upon the performance of services for a public employer '[and] cannot be destroyed ... without impairing a contractual obligation.'" (*Id.* at p. 814.)

In *United Firefighters of Los Angeles v. City v. City of Los Angeles* (1989) 210 Cal.App.3d 1095, the court explained: "[A]ll terms of public employment other than pension rights, including hours to be compensated, are wholly a matter of statute. [Citation.] These aspects of public employment ripen into obligations protected by the contract clause of the federal and state Constitutions only upon an employee's actual performance. [Citation.] In contrast, deferred compensation in the form of pension rights

38.

has the status of a contractual obligation from the moment one accepts public employment." (*Id*. at p. 1105.)

The import of the pension cases is that pension benefits vest with the acceptance of employment based on the nature of those benefits and how they are earned. Enjoyment of pension benefits is deferred, often until many years after the employment commenced; the benefits are earned gradually, by performing services over the span of many years and multiple MOUs. Because the employee begins to earn the pension benefit as soon as he or she begins performing services for the employer, some portion of the employee's right to that deferred compensation vests at that time. Consequently, completely denying an employee a pension after he has already performed services in exchange for the promise of a pension would retroactively deny the employee compensation for work performed and would constitute an impairment of contract under the California and federal constitutions.

In contrast, different rules apply to other employment benefits. In *Olson v. Cory* (1980) 27 Cal.3d 532, the court held unconstitutional as an impermissible impairment of vested contractual rights a statutory amendment that placed limits on cost of living increases of judge's salaries. The court concluded a judge's contractual salary rights could not be changed during the judge's term of office. "A judge entering office is deemed to do so in consideration of—at least in part—salary benefits then offered by the state for that office. If salary benefits are diminished by the Legislature during a judge's term…, the judge is nevertheless entitled to the contracted-for benefits during the remainder of such term." (*Id*. at p. 539.) However, "[a] judge who completes one term during which he was entitled to unlimited cost-of-living increases and elects to enter a new term has impliedly agreed to be bound by salary benefits then offered by the state for the different term." (*Id*. at p. 540.) Thus, a judge's salary benefits under the original statute were vested for the judge's unexpired term of office; when he commenced a new

term after the effective date of the statutory amendment, or when a new judge entered office after that date, the judge was not entitled to the benefits of the prior statute.

In *Fontana,* the court concluded employees did not have vested, contractual rights to personal leave accrual, longevity pay, and retirement health benefits, and those benefits could be altered through collective bargaining. (*Fontana*, *supra*, 67 Cal.App.4th at p. 1218.) The benefits were provided for in successive MOUs. They were reduced in the most recent MOU. Under the MMBA, the collective bargaining process properly included the benefits in issue; those benefits "could not have become permanently and irrevocably vested as a matter of contract law, because the benefits were earned on a year-to-year basis under previous MOU's that expired under their own terms." (*Id.* at p. 1224.) The court distinguished retirement rights, which become vested under the contract clause upon retirement, from employment rights, which may pertain to future retirement, but may be modified prior to retirement. (*Ibid*.)

Thus, nonpension employment benefits do not follow the same rule of vesting as pension rights. Pension rights vest at the outset of employment and may be modified thereafter only on a limited basis. (*California Assn. of Professional Scientists v. Schwarzenegger* (2006) 137 Cal.App.4th 371, 383.) Other employment rights[4] vest (i.e., become complete, binding, and enforceable) only for the period the statute or MOU establishing them remains in effect, or for the term of office of a public official. Generally, employment benefits conferred by MOU are negotiable in bargaining the terms of a subsequent MOU.

*Retired Employees*, on which the Board relied in its discussion of vested rights, is of limited relevance because it addressed the rights of retirees, not current employees, and the question whether an implied contract could confer vested rights on the retirees.

---

[4]    With the possible exception of some longevity based benefits. (See *California League*, *supra*, 87 Cal.App.3d at p. 140.)

There, the California Supreme Court answered a question posed by the United States Court of Appeals for the Ninth Circuit: "'Whether, as a matter of California law, a California county and its employees can form an implied contract that confers vested rights to health benefits on retired county employees.'" (*Retired Employees*, *supra*, 52 Cal.4th at p. 1176.) For more than 20 years, the county had calculated premiums for medical insurance for active employees and retirees by combining the employees and retirees into a single pool. This resulted in lower premiums for retirees than if they had been treated as a separate pool. The county then negotiated MOUs with the active employees and passed a resolution that split the pool. (*Id*. at p. 1177.) The retirees sought to enjoin splitting the pool.

The retirees conceded the past MOUs were silent as to the duration of the unified pool. They alleged the county's long-standing practice of pooling created an implied contractual right to continuation of the unified pool, and the county's action in splitting the pool constituted an impairment of contract in violation of the California and federal constitutions. (*Retired Employees*, *supra*, 52 Cal.4th at pp. 1177–1178.) The court concluded a resolution or ordinance approving an MOU could give rise to implied terms conferring contract rights. (*Id*. at pp. 1180–1187.) It rejected the county's argument that, even if contractual rights could be implied from legislation, vested contractual rights could not; it noted that neither the county nor amici curiae had offered any legal authority for this distinction. (*Id*. at p. 1189.) Further, in the cases the county cited, "the courts found that the particular benefits at issue were not vested, not that vesting was categorically barred. Vesting remains a matter of the parties' intent." (*Ibid*.)

Regarding the retirees' assertion that the unified pool was a form of deferred compensation that vested when they retired, the court noted that whether the retirees' claim was valid and whether they had a vested right to a unified pool was beyond the scope of the question posed by the Ninth Circuit. It added: "However, as with any contractual obligation that would bind one party for a period extending far beyond the

41.

term of the contract of employment, implied rights to vested benefits should not be inferred without a clear basis in the contract or convincing extrinsic evidence." (*Retired Employees*, *supra*, 52 Cal.4th at p. 1191.)

The Board appears to interpret this final quote as authorizing a finding of vested rights when the contractual obligation would not "bind one party for a period extending far beyond the term of the contract of employment" or when there is a clear basis in the contract or convincing extrinsic evidence to support vesting of implied rights. (*Retired Employees*, *supra*, 52 Cal.4th at p. 1191.) In that statement, however, the court was not deciding any issue; it was cautioning restraint in finding vested rights impliedly arising out of public employment MOUs. The court's decision addressed a situation that was similar to the pension cases in that the retirees claimed a vested interest in alleged deferred compensation, earned over time. It differed from the pension cases in that the retirees claimed their rights vested on retirement; they explicitly disavowed any claim the benefits vested when the retirees commenced their service. (*Id.* at p. 1189, fn. 3.) The *Retired Employees* court discussed vesting only in the context of a claim that an alleged element of deferred compensation vested on retirement, when the retirees had fully performed their employment obligations, and the county would therefore be bound to continue providing the benefit throughout the retirees' retirement.

The issue in this case does not concern pension rights or a claim of earned, but long-deferred, compensation. There was no contention by any party that the employees' right under the addenda to be placed in the steps they would have achieved during the two-year MOU period in the absence of the suspension of promotions and step increases vested for each employee at the time the employee was hired or continued throughout his or her employment. As the Board recognized, Union sought only a one-time adjustment of the promotions and step increases suspended during the term of the 2009 MOU. The issue presented by the unfair practices charge involved consideration exchanged between the parties within the term of a single MOU and its addenda: suspension of promotions

and step increases for two years and granting the promotions and step increases in the first full pay period after expiration of the two-year period. At the time the MOU was ratified and put into effect, the parties were bound by the contractual obligations imposed by the MOU and its addenda, for the term of that agreement. (See *Fountain Valley*, *supra*, PERB Dec. No. 625 [11 PERC ¶ 18115, pp. 23, 26–27].) During the first pay period after expiration of the MOU, the employees' right to have their promotions and step increases reinstated became vested in the sense that County's obligation was contractually binding, enforceable, unconditional, and not contingent. It was not vested in the sense in which a pension right becomes vested when an employee's employment commences, and remains vested throughout the employee's employment. Consequently, the rules set out in the Board's discussion of cases concerning vested pension rights do not apply to this matter. The suggestion that the pension rules apply and that the rights in issue in this case vested at the commencement of employment are inaccurate and should be excluded from the Board's decision.

## *DISPOSITION*

The petition for a writ of extraordinary relief from the decision of the Board is denied. Pursuant to Government Code section 3509.5, subdivision (b), however, we modify the Board's decision by deleting from it the section headed: "Prohibiting Retroactive Imposition of Terms Containing Economic Concessions is Consistent with California Judicial Authority Regarding Vested Rights of Public Employees," beginning on page 35 of the decision and ending on page 42. The Union is awarded its costs on appeal. (Cal. Rules of Court, rule 8.493(a)(1)(B).)

_____

HILL, P.J.

WE CONCUR:

_____

LEVY, J.

_____

GOMES, J.

44.